Anselm HOLMAN, Petitioner–Appellant,

v.

Thomas PAGE, Menard Correctional Center, Respondent–Appellee.

No. 95–2758.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1996.

Decided Aug. 28, 1996.

Ralph Ruebner (argued), John Marshall Law School, Chicago, IL, for petitioner–appellant.

Rita M. Novak, Michael Hurst (argued), Office of the Atty. Gen., Chicago, IL, for respondent–appellee.

Before CUMMINGS, COFFEY, and MANION, Circuit Judges.

MANION, Circuit Judge.

Convicted murderer-rapist Anselm Holman petitioned for a writ of habeas corpus alleging his natural life sentence imposed

under Illinois law was constitutionally improper and that he was denied the right to effective assistance of appellate counsel. The district court denied the petition. Holman appeals. We affirm.

## I.

On the night of May 11, 1984, 75–year–old Mary Brackenridge lay asleep on her couch next to her seven-year-old adopted son, Ricky Brown. Outside, Anselm Holman, 17, and Richie Cole, 16, were sizing up Mary's house. They knocked on the front door, but Mary, still sleeping, did not respond. Holman told Cole to stay on the front steps and watch for police, and then went around back, broke into the rear of the home, and let Cole in the front door. The two then headed upstairs, finding Mary and Ricky asleep.

On Holman's orders, Cole grabbed Ricky and stuffed him in a closet. Holman forced Mary, crying and fighting, into a back room and onto a bed, ripped off her underwear, and began to rape her. Cole went to an adjacent room and waited, closing the bedroom door behind him. Holman then emerged several minutes later and offered Cole a turn, but he declined. Holman returned to the room to rape Mary again. Mary cried out and struggled for a time, and then fell silent, suffocated by Holman's hand.

When Holman finally left the bedroom, he and Cole rummaged through the house. Finding nothing of value, they left. Ricky heard everything from the closet. When he emerged he found Mary on the bed, a white substance flowing from her mouth, but he did not understand she was dead. The next morning Ricky told a neighbor what had happened. The neighbor found Mary lying on the bed with her dress pulled up. An autopsy revealed Mary had been murdered by asphyxia and found semen in her bruised vaginal canal. Several witnesses testified at trial that they saw Holman and Cole at Mary's home the night of the murder. Both Cole and Holman confessed and gave detailed statements. Holman essentially admitted the foregoing facts, except he claimed Cole, not he, suffocated Mary.

In separate trials, Holman and Cole were found guilty of murder, rape, residential burglary, robbery, and home invasion. Explicitly finding Holman had suffocated Mary, the trial judge sentenced him to natural life in prison (life without possibility of parole) for murder, concurrent extended terms of 60 years each for rape and home invasion, and 30 years for residential burglary. Cole, whom the judge found less responsible for the murder, was sentenced to 40 years for murder, concurrent terms of 30 years for rape and home invasion, and 15 years for the burglary.

Represented by separate appellate counsel, Holman and Cole appealed. The Appellate Court of Illinois affirmed Holman's convictions, although it reduced the sentences for rape and home invasion to 30 years. However, the court reversed Cole's convictions because his statements were the fruit of an illegal arrest. *People v. Cole*, 168 Ill.App.3d 172, 118 Ill.Dec. 965, 972–74, 522 N.E.2d 635, 642–44 (1988). Holman's appellate attorney had not challenged the suppression rulings. *See People v. Holman*, 250 Ill.App.3d 503, 189 Ill.Dec. 905, 907, 620 N.E.2d 1222, 1224 (1993).

Holman later petitioned for post-conviction relief in state court alleging that (1) the failure of his appellate counsel to challenge the admission of his post-arrest statements on appeal constituted ineffective assistance of appellate counsel; (2) the Illinois sentencing scheme authorizing a natural life sentence gives judges inappropriate discretion to impose a life sentence rather than a determinate extended term; and (3) the Illinois statute authorizing a natural life sentence is unconstitutionally vague. The petition was denied and the denial affirmed on appeal. *Id.*, 189 Ill.Dec. at 917, 620 N.E.2d at 1234. The Supreme Courts of both Illinois and the United States denied further review. *People v. Holman*, 153 Ill.2d 564, 191 Ill.Dec. 624, 624 N.E.2d 812 (1993); *Holman v. Illinois*, —— U.S. ——, 114 S.Ct. 1652, 128 L.Ed.2d 370 (1994).

On January 24, 1995, Holman filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in federal district court raising the three issues previously argued in his

unsuccessful petition for state post-conviction relief. The district court denied Holman's petition and he appeals. We first address Holman's two-part attack on the Illinois sentencing scheme and then turn to his ineffective assistance claim.

## II.

Under Illinois law, when a sentencing judge determines that a murder for which a defendant was convicted was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," he may choose either of two sentencing options. He may impose a natural life prison term without possibility of release. ILCS ch. 730, para. 5/5–8–1(a)(1)(b) (1995). Or he may impose a determinate extended prison sentence of not less than 40 and not more than 80 years. *Id.* paras. 5–5–3.2(b)(2) and 5–8–2(a)(1). The Illinois Supreme Court has held that the "exceptionally brutal" language which triggers either a natural life term or an extended term of years is identical. *People v. Andrews*, 132 Ill.2d 451, 139 Ill.Dec. 469, 475, 548 N.E.2d 1025, 1031 (1989).

### A.

■ Holman contends this sentencing scheme invites arbitrariness and disparate treatment of similarly situated offenders and as such violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. For support he directs us to the dissent in *Harmelin v. Michigan*, 501 U.S. 957, 1009–10, 111 S.Ct. 2680, 2709–10, 115 L.Ed.2d 836 (1991) (dissenting opinion), for the proposition that a natural life sentence cannot be imposed arbitrarily, and to *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), *Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982), and *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), for the assertion that criminal sentences must be proportional. These cases addressed a type of arbitrariness or disparate treatment—the imposition of allegedly disproportionate sentences—and whether that is proscribed by the Eighth Amendment's prohibition against cruel and unusual punishments. In *Harmelin* a splintered Supreme Court affirmed an exceedingly narrow proportionality element as part of the Eighth Amendment analysis. "The Eighth Amendment," wrote Justice Kennedy in a concurrence defining the limits of the proportionality principle, "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." 501 U.S. at 1001, 111 S.Ct. at 2705 (Kennedy, J., concurring).

Holman does not challenge his sentence as disproportionate under the Eighth Amendment, and wisely so. Despite disagreement over the standard of review, the *Harmelin* majority agreed that a mandatory life sentence for a first-time felon convicted of possessing 650 grams of cocaine was not cruel and unusual punishment. *Id.* at 994–96, 111 S.Ct. at 2700–02. With *Harmelin* as a point of reference, there is no chance that Holman's life sentence for the rape and murder of a 75–year–old woman violates the Eighth Amendment. Holman seems to urge the creation of a more exacting proportionality standard under the Due Process or Equal Protection Clauses. We decline the invitation. The Eighth Amendment explicitly addresses the constitutionality of punishments. *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994), holds that "[w]here a particular amendment [to the Constitution] 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)); *see also* *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir.1994) ("[C]laims alleging substantive due process violations often are more appropriately analyzed under the more specific guarantees of the various provisions of the Bill of Rights."); *Armendariz v. Penman*, 75 F.3d 1311, 1325–26 (9th Cir.1996) ("Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection. . . ."). This principle, which in this context also applies to an equal protection claim, counsels against opening a new avenue under

the Due Process or Equal Protection Clauses for challenging the proportionality of sentences. *Cf. United States v. Marshall,* 908 F.2d 1312, 1320 (7th Cir.1990) (*en banc*) ("This is not an appropriate case for the deployment of that elusive doctrine [*i.e.,* substantive due process].").

■ As in *United States v. Marshall,* 908 F.2d 1312, Holman's due process and equal protection attack on the entire Illinois sentencing scheme is not about his own sentence. Rather, he objects to the possibility that others might receive sentences too long or too short. "But these are only possibilities, which have nothing to do with [Holman's] sentence[ ]." *Id.* at 1320. Holman's sentence of natural life imprisonment for murder is eminently rational. Illinois has the highest interest in meting out severe punishment for such brutality, both to deter others of similar moral depravity from committing like crimes and to prevent repeat offenses. It has materially advanced that interest by incarcerating Holman for the rest of his life. Some rational connection between the sentence and the offense is all the Constitution enjoins under the Due Process and Equal Protection Clauses. *Id.; Chapman v. United States,* 500 U.S. 453, 465, 111 S.Ct. 1919, 1927–28, 114 L.Ed.2d 524 (1991); *see Jones v. United States,* 463 U.S. 354, 362 n. 10, 103 S.Ct. 3043, 3048 n. 10, 77 L.Ed.2d 694 (1983) (an argument based on equal protection essentially duplicates an argument based on due process); *French v. Heyne,* 547 F.2d 994, 997 (7th Cir.1976) ("[I]n the absence of fundamental rights or a suspect classification, equal protection requires only that a classification which results in unequal treatment bear some rational relationship to a legitimate state purpose.")

■ Having received a constitutional sentence, Holman is not "entitled to assert third parties' rights to better sentencing practices" and thereby improve his own lot. *Marshall,* 908 F.2d at 1320. Illinois' sentencing scheme might indeed permit another defendant guilty of the same crime to receive a lesser sentence. Yet that is no reason for altering Holman's punishment or declaring the law unconstitutional. Judicial discretion naturally leads to discrepancies in sentenc-

ing, as Holman complains. But even wide sentencing discretion in the abstract is not a violation of due process or equal protection. *Id.* at 1321. As we held in *Marshall,* the issue is the appropriateness of the sentence given the defendant's crime: "Discretion, even if it ends in grossly unequal treatment according to culpability, does not entitle a guilty defendant to avoid a sentence appropriate to his own crime." *Id.; see Williams v. Illinois,* 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970) ("Sentencing judges are vested with wide discretion in the exceedingly difficult task of determining the appropriate punishment in the countless variety of situations that appear. The Constitution permits qualitative differences in meting out punishment and *there is no requirement that two persons convicted of the same offense receive identical sentences.*") (emphasis added).

At any rate, it is not unconstitutional for Illinois to give a sentencing judge a choice between two statutes providing different penalties for identical conduct. *Marshall,* 908 F.2d at 1321; *see United States v. Batchelder,* 442 U.S. 114, 124–26, 99 S.Ct. 2198, 2204–05, 60 L.Ed.2d 755(1979). We fail to detect a meaningful constitutional distinction between a single statute permitting the imposition of a 40–year to natural life sentence, which is undoubtedly constitutional, and two statutes from which a judge may choose, one allowing a 40– to 80–year sentence and the other a natural life sentence. Both schemes grant wide latitude to the sentencing judge; both are constitutional. *See Marshall,* 908 F.2d at 1321.

**B.**

■ Holman further argues that when employed as a criterion for imposing a prison term of natural life, the "exceptionally brutal or heinous behavior indicative of wanton cruelty" standard is unconstitutionally vague. Holman acknowledges that we previously rejected this argument in *United States ex rel. Peeples v. Greer,* 739 F.2d 262, 265 (7th Cir.1984) (extended term provision), and *Barnhill v. Flannigan,* 42 F.3d 1074, 1074 (7th Cir.1994) (natural life provision).

It is important to distinguish among the relevant types of vagueness objections. Vagueness for due process purposes entails "lack of notice, and hence may be overcome in a specific case where reasonable persons would know that their conduct is at risk. Vagueness challenges to statutes not threatening First Amendment interests are examined *in light of the facts of the case at hand.*" *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988) (emphasis added). Holman does not claim he lacked notice that murdering a woman during rape might result in life imprisonment, and it would be preposterous to do so.

The Supreme Court has also recognized a separate vagueness inquiry under the Eighth Amendment. "Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972)." *Id.* at 361–62, 108 S.Ct. at 1858.

It is now established in this circuit that the Eighth Amendment vagueness inquiry does not apply in noncapital cases. That detailed inquiry is an anomaly of the Supreme Court's death penalty jurisprudence. *See Barnhill,* 42 F.3d at 1079. Simply put, death is different. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (The death penalty "is qualitatively different from a sentence of imprisonment, however long."). That difference creates a unique "need for reliability on the determination that death is the appropriate punishment in a specific case." *Zant v. Stephens,* 462 U.S. 862, 884–85, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983) (quoting *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991). Natural life imprisonment is a stern punishment, for some perhaps worse than death, but it does not raise similar concerns. With the possibility of future judicial review, executive clemency, and legislative amnesty to correct errors and mitigate injustices, life imprisonment does not approach the finality of the death penalty. These considerations have led us to reject applying the Eighth Amendment vagueness analysis in noncapital cases, *Barnhill,* 42 F.3d at 1079; *see Peeples,* 739 F.2d at 264–65, and we do so again.

In so holding, we do not imply that the "wanton cruelty" language might otherwise be unconstitutionally vague. On some level, virtually every verbal or written formulation is vague; there is always some circumstance that puts interpretative pressure on a word and exposes the limits of its meaning. When it comes to terms like "exceptionally brutal," "heinous," and "wanton cruelty"—all resounding with strong moral condemnation— precise meaning is probably impossible. Thus, in the application, terms like "wanton cruelty" will at some point be subject to a judgment call and a charge of vagueness. That is the nature of a law employing general standards. The Supreme Court has declared such indeterminacy a concern in capital cases. *See Maynard,* 486 U.S. at 363–64, 108 S.Ct. at 1858–59. But as we have said, capital cases are different. The Constitution does not require, in the name of exactness, a statutory laundry list of precisely defined "heinous" acts or detailed descriptions of how one must act or what one must do to commit "wanton cruelty" before life imprisonment may be imposed.

If a perfect definition of "exceptionally brutal" or "heinous" or "wanton cruelty" is beyond us, the definitions commonly used are adequate to the task, and we are confident that murdering an elderly woman while raping her fits the bill. The judge who presided at the Holman and Cole trials and heard all the evidence made the explicit finding at sentencing that Holman suffocated Mary during the rape to keep her from calling out for help. Holman's purpose for entering the home that night was theft, a crime whose motives and benefits are easy enough to understand. But the animalistic nature of what followed is inexplicable. Holman encountered 75–year–old Mary sleeping with her 7– year–old boy on the couch. He could have let her be and quietly gone about his thievery. Or better yet, he could have left the

home altogether, perhaps touched by the tranquil sight, or, more likely, by fear of being caught. But no, this scene inspired in Holman the barbaric drive to rape—and not once, but twice. The first violation completed, Holman emerged to offer Cole a chance to further savage Mary. When Cole declined, Holman reentered the room and raped Mary again, smothering her cries for help and ultimately her life with his hand. This was no crime of provoked anger—no brief fit of jealous rage. This was vicious, bestial behavior, utterly devoid of sense or humanity. Whatever their limitations, words do have meaning. We have no trouble agreeing with the sentencing judge that the words "heinous behavior indicative of wanton cruelty" fit this crime. In fact, conduct need not descend to this level of savagery to come under that definition. As we have held before, the Illinois statute authorizing Holman's sentence is not unconstitutionally vague. *Barnhill,* 42 F.3d at 1079.

## III.

■ Finally, Holman claims he was denied the right to effective assistance of appellate counsel when his attorney failed to appeal the denial of his motion to suppress. He argues his post-arrest statements should have been suppressed as the product of an arrest violative of the Fourth Amendment, and that the failure of appellate counsel to appeal the issue was incompetence that resulted in a deprivation of his constitutional right to counsel.

The facts surrounding the arrest and subsequent questioning are somewhat disputed, but are roughly as follows. Acting on information that someone named "Main" had been at Mary's home the night before, Detective Ralph Vucko located Holman at about 2 p.m. on May 12, 1984, the day after the murder, and learned that his nickname was "Main." According to Vucko and his partner, Detective Vic Switski, Holman voluntarily accompanied them in their squad car to the police station for questioning about the murder. Switski testified that Holman could have gotten out of the squad car if he wished, but acknowledged that he would have tried to talk him out of it. On the way, Holman

allegedly told the officers that Richie Cole was with him at Mary's home the night of the murder. Holman led them to Cole's home and then to the home of Cole's girlfriend where they found Cole, after which the officers took Holman and Cole to the police station. Holman tells this portion differently. He claims he was taken from his home to the police station while still high on marijuana from the night before, placed in a room, and handcuffed to the wall. There, not in the squad car en route, Holman told them about Cole. It was only then that he accompanied the detectives to Cole's house, Holman says.

Once at the station, Holman and Cole were placed in separate interview rooms. Switski testified that the door of Holman's room was not locked and that Holman was free to leave, though he again admitted that he would have tried to talk him out of it. During an interview Cole implicated both Holman and himself in the murder. Immediately thereafter, at about 4 p.m., Holman was arrested (though not told of the specific charge), informed of his *Miranda* rights, and interrogated. When Holman denied knowledge of the murder the detectives left to look for Ricky Brown, Mary's 7–year–old boy, for corroboration of Cole's story. Initially they could not find Ricky, so Switski and Vucko returned to the station for further questioning. After again being given his *Miranda* rights, Holman made some incriminating statements. Ricky was later located and a line-up was held, but Ricky could not identify Cole or Holman. Holman was *Mirandized* and interrogated again that night and three times the following day. At the suppression hearing Holman testified that the detectives beat him up and denied him food and use of the bathroom until he was placed in the lockup that night. He also stated that he signed an incriminating statement only after detectives Switski and Vucko and an Assistant State's Attorney promised he would be released if he signed some papers. The state's witnesses deny this. They claim Holman was not high on marijuana during any of the interrogations, was not physically abused, and was given food, water, and access to a bathroom. They also contradicted Holman's

testimony that he was deprived of sleep and promised release if he signed certain papers.

The trial court denied the motion to suppress Holman's post-arrest statements, finding they were made voluntarily and that he had not been placed under arrest until after Cole implicated him in the crime. Holman unsuccessfully appealed his conviction on a variety of grounds but, as noted above, did not challenge the denial of his motion to suppress. In a petition for post-conviction relief Holman raised the same issue before us now, including that his counsel's failure to appeal the denial of the motion to suppress constituted ineffective assistance of appellate counsel. After a detailed review of the conflicting evidence, the Appellate Court of Illinois held that "it is clear that [Holman] was seized or detained as defined by the Fourth Amendment only *after* Cole had implicated him," *Holman*, 189 Ill.Dec. at 910, 620 N.E.2d at 1227 (emphasis in original), and that based on Cole's incriminating statements there was adequate probable cause to arrest Holman. *Id.*, 189 Ill.Dec. at 911, 620 N.E.2d at 1228. It therefore concluded that Holman was not prejudiced by his attorney's failure to raise the Fourth Amendment issue on appeal and thus was not denied the effective assistance of counsel. *Id.*, 189 Ill.Dec. at 914, 620 N.E.2d at 1231; *see Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674 (1984). Holman has reargued the same issue in his federal habeas petition.

 If the question before us were whether Holman was improperly arrested, it would be largely academic by now. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. at 3052. That is because even if there has been an illegal search or seizure, there is no constitutional right to be vindicated through the writ of habeas corpus- there is no *individual* right to have improperly gathered evidence excluded from a crim-

inal trial. The exclusionary rule is not for the benefit of criminals, or even the accused. "[I]ts sole rational justification is the experience of its indispensability in exerting general legal pressures to secure obedience to the Fourth Amendment on the part of law-enforcing officers." Amsterdam, *Search, Seizure, and Section 2255: A Comment*, 112 U.Pa.L.Rev. 378, 388–89 (1964) (quoted in *Stone*, 428 U.S. at 487 n. 24, 96 S.Ct. at 3048 n. 24). *Stone* made that clear: "The primary justification for the exclusionary rule ... is the deterrence of police conduct that violates Fourth Amendment rights." *Stone*, 428 U.S. at 486, 96 S.Ct. at 3048. The *"rule is not a personal constitutional right.* It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any reparation comes too late." *Id.* (internal quotation marks omitted) (emphasis added). *Stone* determined that a fair opportunity to argue for suppression at trial and on appeal is sufficient to deter police violations of the Fourth Amendment—the function of the exclusionary rule—and that therefore such issues cannot be raised in a federal habeas action. *Id.* at 494–95, 96 S.Ct. at 3052–53.

There is no doubt that Holman had a fair opportunity to litigate his Fourth Amendment claims and request suppression of allegedly unlawful evidence. The matter was fully litigated before the trial court and Holman was free to appeal the ruling. So he cannot directly raise a Fourth Amendment challenge. However, a narrow walkway might permit him to raise Fourth Amendment issues through the back door via a Sixth Amendment claim that his attorney's handling of the issue (here on appeal) was incompetent. *Kimmelman v. Morrison*, 477 U.S. 365, 382–83, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). The focus of the inquiry is not whether the Fourth Amendment issue was properly decided, which on habeas review *Stone* precludes, but whether defendant was denied his Sixth Amendment right to competent counsel. Thus, the "claim must be judged as a Sixth Amendment claim, according to the standards set forth in [*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052], and not as a Fourth Amendment claim governed by *Stone*." *Morrison*, 477 U.S. at 393, 106 S.Ct. at 2592 (Powell, J., concur-

ring). The question before us is whether the failure of Holman's attorney to appeal the trial court's denial of his motion to suppress constituted ineffective assistance of appellate counsel. *See Evitts v. Lucey,* 469 U.S. 387, 396–97, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985) (defendant entitled to effective assistance of counsel in direct appeals of right).

■■■ "[T]he Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a fair trial.'" *Lockhart v. Fretwell,* 506 U.S. 364, 368, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) (quoting *Strickland,* 466 U.S. at 684, 104 S.Ct. at 2063). *Strickland* "identified two components to any ineffective assistance claim: (1) deficient performance and (2) prejudice." *Fretwell,* 506 U.S. at 369, 113 S.Ct. at 842. A criminal defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*" *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064 (emphasis added); *Fretwell,* 506 U.S. at 369, 113 S.Ct. at 842. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Morrison,* 477 U.S. at 374, 106 S.Ct. at 2582. "Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *Fretwell,* 506 U.S. at 369, 113 S.Ct. at 842. In a habeas action, only those "who can prove under *Strickland* that they have been denied a fair trial by the *gross incompetence* of their attorneys will be granted the writ...." *Morrison,* 477 U.S. at 382, 106 S.Ct. at 2586 (emphasis added).

■■■ This is a "highly demanding" standard, especially where failure to properly argue for suppression under the Fourth Amendment is the basis for the Sixth Amendment claim. *Id. Strickland*'s prejudice prong ("[u]nreliability or unfairness") is not met "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Fretwell,* 506 U.S. at 372, 113 S.Ct. at 844. The Fourth Amendment right to be free from "unreasonable searches and sei-

zures" is of course a fundamental constitutional right. U.S. Const., amend. IV. By contrast, it is well established that the exclusionary rule is not a right but a prophylactic rule of evidence (a remedy of sorts) "'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Stone,* 428 U.S. at 486, 96 S.Ct. at 3048 (quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)); *see also id.,* at 486, 96 S.Ct. at 3048 ("[Exclusionary] rule is not a personal constitutional right."); *Morrison,* 477 U.S. at 374, 106 S.Ct. at 2582 (Fourth Amendment "not a trial right."). Which is why in the context of an ineffective assistance claim, "a good Fourth Amendment claim *alone* will not earn a prisoner federal habeas relief." *Morrison,* 477 U.S. at 382, 106 S.Ct. at 2586 (emphasis added). There must be more. Something must call into question the validity or fairness of the trial.

■■■ The Supreme Court has indicated that "the admission of illegally seized but reliable evidence does not lead to an unjust or fundamentally unfair verdict." *Morrison,* 477 U.S. at 396, 106 S.Ct. at 2594 (Powell, J., concurring) (citing cases). "[S]uch evidence ordinarily is excluded only for deterrence reasons that have no relation to the fairness of the defendant's trial." *Id.* (citing *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677 (1984); *Stone,* 428 U.S. at 486–88, 96 S.Ct. at 3048–49; and *Calandra,* 414 U.S. at 348, 94 S.Ct. at 620). In fact, as a number of Supreme Court justices have pointed out, the exclusionary rule may well make verdicts less reliable by precluding the jury from considering all—and sometimes the most—probative evidence. *See Morrison,* 477 U.S. at 396, 106 S.Ct. at 2594 ("[I]t has long been clear that exclusion of illegally seized but wholly reliable evidence renders verdicts less fair and just, because it 'deflects the truthfinding process and often frees the guilty.'") (Powell, J., concurring) (quoting *Stone* ); *Stone,* 428 U.S. at 540, 96 S.Ct. at 3073–74 (often "the only consequence" of exclusion "is that unimpeachable and probative evidence is kept from the trier of fact and the truth-finding function of pro-

ceedings is substantially impaired or a trial totally aborted") (White, J., dissenting).

Suppressing reliable evidence can undoubtedly have an impact on the outcome of a trial, and in that sense the failure of defense counsel to properly argue a Fourth Amendment claim can prejudice his client. But that is not "prejudice" as the *Strickland* test employs the term: "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Fretwell*, 506 U.S. at 370, 113 S.Ct. at 843. The harm suffered by a defendant whose counsel was ineffective in attempting to have reliable evidence suppressed "is not the denial of a fair and reliable adjudication of his guilt, but rather the absence of a windfall." *Morrison*, 477 U.S. at 396, 106 S.Ct. at 2594 (Powell, J., concurring). Prejudice in the *Strickland* sense refers to "unprofessional errors" so egregious "that the trial was rendered unfair and the verdict rendered suspect." *Id.* at 374, 106 S.Ct. at 2582 (majority opinion); *see United States v. Cronic*, 466 U.S. 648, 655–57, 104 S.Ct. 2039, 2044–46, 80 L.Ed.2d 657 (1984). "The touchstone of an ineffective assistance claim is the fairness of the adversary proceeding," *Lockhart*, 506 U.S. at 370, 113 S.Ct. at 843, whose " 'premise ... is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' " *Evitts*, 469 U.S. at 394, 105 S.Ct. at 835 (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975)).

The Supreme Court has not decided whether prejudicial ineffective assistance of counsel can be established on federal habeas review of a state court conviction based solely on a claim that counsel's incompetence resulted in the admission of reliable evidence gathered in violation of the Fourth Amendment. The question was left open in *Morrison*. In a concurrence, Justice Powell joined by two other justices argued that in light of the prophylactic nature of the exclusionary rule and the constitutional function of the Sixth Amendment's right to competent counsel, it is likely that no prejudice under *Strick-*

*land* arises: "Because the fundamental fairness of the trial is not affected [when counsel is ineffective on a Fourth Amendment claim], our reasoning in *Strickland* strongly suggests that such harm does not amount to prejudicial ineffective assistance of counsel under the Sixth Amendment." *Morrison*, 477 U.S. at 396, 106 S.Ct. at 2594 (Powell, J., concurring).

We follow the reasoning of Justice Powell and the two justices who joined his concurrence in *Morrison*. It is inconsistent with the function of the exclusionary rule to permit a criminal defendant on federal habeas review to claim prejudice because but for his counsel's incompetence on the suppression issue he would have gotten away with the crime. Such a claim may be factually true—but that alone does not entitle a convict to a new trial because that alone does not constitute "prejudice" within the meaning of *Strickland*. *Strickland* prejudice relates to the fairness of the proceedings and to the confidence one may place in the outcome, i.e., to the correctness of the verdict. The Supreme Court has made clear that it is not unfair to a defendant for a jury to consider reliable but improperly gathered evidence of guilt. Fairness to the accused has nothing to do with the purpose of the exclusionary rule, which is why Fourth Amendment claims cannot be raised on habeas review. *See Stone*, 428 U.S. at 486, 494–95, 96 S.Ct. at 3048, 3052–53. The exclusionary rule exists to exert pressure on law enforcement officials to obey the Fourth Amendment for the benefit of all citizens, not to give windfalls to the obviously guilty. "As it serves this function, the rule is a needed, but grud[g]ingly taken, medicament; no more should be swallowed than is needed to combat the disease." *Id.* at 487 n. 24, 96 S.Ct. at 3049 n. 24 (quoting *Amsterdam, supra* at 38889). Nor does failure to apply the rule prejudicially impact the correctness of the verdict; indeed, it enhances the truthfinding process by permitting the consideration of valuable probative evidence. *See Morrison*, 477 U.S. at 396, 106 S.Ct. at 2594 (Powell, J., concurring); *Stone*, 428 U.S. at 540, 96 S.Ct. at 3073–74 (White, J., dissenting). Thus, although counsel may be ineffective in dealing with a defendant's Fourth Amendment claims, the defendant

suffers no prejudice under *Strickland* as a result. *Cf. Woods v. Whitley,* 933 F.2d 321, 324 (5th Cir.1991) ("[W]e are hard put to see how the erroneous receipt into evidence of evidence illegally seized could ever result in prejudice sufficient to justify its omission from an earlier [petition for] writ [of habeas corpus].") (citing *Morrison,* 477 U.S. 365, 106 S.Ct. 2574, (Powell, J., concurring)).

■ None of which is to suggest that it is irrelevant to an ineffective assistance claim on federal habeas review that at trial (or on appeal) defense counsel was inept on Fourth Amendment issues. Unprofessional performance at a suppression hearing can be used as evidence of counsel's overall incompetence. Where such incompetence renders the proceedings unfair or unreliable, prejudice will be found under *Strickland* and a new trial ordered.[1] We merely hold that under *Strickland* no prejudice exists when evidence gathered in violation of the Fourth Amendment is erroneously admitted at trial.

Holman's ineffective assistance claim is based solely on his counsel's failure to appeal the denial of his motion to suppress. No other evidence of incompetence has been adduced on appeal. Thus, even assuming appellate counsel was ineffective, his alleged error in not appealing the suppression issue did not render the proceedings unfair or undermine confidence in the jury's verdict and thus did not deprive Holman of his Sixth Amendment rights.

### IV.

Holman's sentence was not unconstitutional and he was not deprived of his Sixth Amendment rights. The district court's denial of Holman's petition for writ of habeas corpus is therefore

AFFIRMED.

---

1. We express no opinion whether, in light of *Stone*'s teachings on the exclusionary rule, im-properly gathered evidence must be excluded on retrial.