[736 NYS2d 743]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
KRISTIAN HANSEN, Appellant.

Third Department, January 17, 2002

---

### APPEARANCES OF COUNSEL

*Paul J. Connolly*, Albany, for appellant.

*Paul A. Clyne, District Attorney*, Albany (*Christopher D. Horn* of counsel), for respondent.

### OPINION OF THE COURT

CARDONA, P. J.

On April 28, 1995, David Goyette, a cab driver in the City of Albany, was struck in the back of his head with a hammer and robbed. On August 1, 1996, the body of Santo Cassaro, shot once in the back of his head, was found inside his cab in front of 686 Morris Street in the City of Albany. A .25 caliber shell casing was found in the cab. After an informant implicated defendant in both crimes, Albany Police Detectives went to 499 Third Street in the City of Albany and located defendant who accompanied them to the police station. During questioning, defendant made oral and written statements implicating himself in the robbery and homicide of Cassaro. Later, pursuant to a search warrant, the police recovered a .25 caliber handgun from the attic space at 499 Third Street and Cassaro's wallet from the trash at the curb.

Defendant was indicted with murder in the first degree, three counts of murder in the second degree and robbery in the first degree, stemming from the incidents involving Cassaro. A sixth count charged robbery in the first degree based upon the incident involving Goyette. In November 1996, the People filed notice of their intention to seek the death penalty. Prior to trial, County Court granted defendant's motion to sever the sixth count of the indictment and defendant pleaded guilty to that count. On May 13, 1999, the People withdrew their notice of intention to seek the death penalty. Thereafter, on June 16, 1999, new counsel was properly substituted for the Capital Defender Office (*see*, Judiciary Law § 35-b [11]; County Law art 18-B) since defendant was no longer facing the death penalty.

Defendant moved to suppress his oral and written statements, the .25 caliber handgun and to dismiss the indictment.

After County Court denied the motions, defendant, following a jury trial, was found guilty of murder in the first degree and robbery in the first degree. Thereafter, County Court sentenced defendant to 5 to 15 years' imprisonment upon his plea to the sixth count of the indictment. As a result of his murder in the first degree conviction, defendant was sentenced to life in prison without the possibility of parole. The court determined that such sentence would run consecutively to the term of imprisonment imposed under the sixth count. Upon his conviction for robbery in the first degree, defendant was sentenced to 12½ to 25 years' imprisonment to be served concurrently with his life without parole sentence.

Defendant's initial argument is that County Court erred in denying his motion to dismiss the indictment pursuant to CPL 210.35 (5) because the Grand Jury proceeding was "defective" (see, CPL 210.20 [1] [c]) in three respects. First, he alleges that the prosecutor should have disclosed his accomplice's cooperation agreement to the Grand Jury. Second, he argues that the People impaired the integrity of the Grand Jury by presenting evidence of the Goyette robbery without instruction that it was not to be considered as evidence of defendant's predisposition to commit the Cassaro robbery/homicide. Third, he contends that perjured testimony given by Melissa Davis impaired the integrity of the Grand Jury.

■ Turning to defendant's first argument for dismissal, Davis, defendant's then 15-year-old accomplice and girlfriend, testified before the Grand Jury as to the events surrounding Cassaro's death. She indicated that on August 1, 1996, defendant told her that he wanted to rob a cab to get money to pay a drug dealer. He was armed with a .25 caliber handgun belonging to Davis's mother. Davis agreed to defendant's request that she call a company to send a cab to 686 Morris Street. She indicated that after that call was made, defendant told her that when the cab arrived they would get in, he would shoot the driver, and she would take his wallet. Davis stated that when Cassaro's taxi arrived, defendant entered the cab before her and seated himself in the backseat. As she entered the front seat, defendant shot Cassaro in the head and told her to grab his wallet. She did so and the two fled the scene netting the sum of $2.

Prior to her testimony, Davis executed a written waiver of immunity before the Grand Jury. The prosecutor did not inform the Grand Jurors that, in exchange for Davis's testimony, she would only be charged with robbery. He did indicate that he

had some "discussions as to what charges would be proposed to * * * the Grand Jury * * * in connection with [her] testimony." We note that "[d]ismissal of an indictment under CPL 210.35 (5) is an 'exceptional' remedy" (*People v Landtiser*, 222 AD2d 525, 526-527; *see, People v Darby*, 75 NY2d 449, 455), which is only warranted "where the integrity of the Grand Jury proceeding is impaired and prejudice to the defendant may result" (*People v Talley*, 273 AD2d 883, 883, *lv denied* 95 NY2d 893; *see,* CPL 210.20 [1] [c]; 210.35 [5]; *People v Huston*, 88 NY2d 400, 409). A Grand Jury proceeding will not be invalidated when a prosecutor withholds information which does not " 'materially influence the Grand Jury investigation' " (*People v Landtiser, supra,* at 527, quoting *People v Bartolomeo*, 126 AD2d 375, 395, *lv denied* 70 NY2d 702). Here, the evidence withheld pertained to Davis's credibility, a collateral issue to the basic one which the Grand Jury had to decide, namely, whether there was "legally sufficient evidence that a crime [had been] committed and reasonable cause to believe that * * * defendant committed it" (*People v Kaba*, 177 AD2d 506, 507, *lv denied* 79 NY2d 859). The information omitted was not essential to the Grand Jury's responsibility to determine whether a prima facie case existed (*see, People v Calbud, Inc.,* 49 NY2d 389, 396) and, therefore, did not materially affect the Grand Jury's investigation. Accordingly, we find defendant failed to satisfy the "impairment of integrity" test (*see,* CPL 210.35 [5]; *People v Darby, supra,* at 455).

Next, we find that the People's presentation of evidence of the Goyette robbery without a limiting instruction did not prejudice defendant in light of the remaining evidence presented to the Grand Jury (*see, People v Talley, supra,* at 883; *People v Rivas*, 260 AD2d 583, 584, *lv denied* 93 NY2d 1025). Finally, defendant argues that Davis presented perjured testimony which impaired the integrity of the Grand Jury. The allegation of perjury is based on the affidavit of an intern at the Capital Defender Office who interviewed Davis two years after her Grand Jury testimony. The intern recounted that Davis advised her, contrary to her Grand Jury testimony, that defendant never expressed the intention of killing Cassaro and she did not see whether Cassaro's arm was raised at the time of the shooting.* We agree with County Court that this hearsay evidence provided no basis for it to speculate that Davis's

---

* At this stage in the case it was the defense's theory that defendant did not intend to shoot Cassaro but that the gun discharged when Cassaro raised his arm and struck it.

testimony was perjurious (*see, People v Goetz*, 68 NY2d 96, 117). We note the absence of any proof in the record that the prosecutor knowingly used perjured testimony (*see, People v Hutson*, 157 AD2d 574, 574, *lv denied* 75 NY2d 967). Moreover, Davis's testimony was not the only evidence submitted of defendant's intent to kill (*see, People v Goetz, supra*, at 117). The testimony of the People's firearm expert established that the gun was a semiautomatic weapon that could not be fired without first being cocked, that it functioned properly and that it required 7½ pounds of pressure on the trigger in order to fire, a "relatively heavy" trigger pull. In our view, County Court properly denied defendant's motion to dismiss the indictment.

■ Defendant next argues that County Court erred by denying his motion to suppress his statements and the .25 caliber handgun seized at 499 Third Street. Initially, we note that the People conceded defendant's standing to object to the entry into and seizure of the handgun from that location. Defendant contends that his statements and the physical evidence should be suppressed as products of an unlawful warrantless entry under the Fourth and Fourteenth Amendments of the US Constitution, as well as under NY Constitution, article I, § 12. Additionally, in his supplemental *pro se* brief, defendant alleges, for the first time on appeal, that he was arrested and handcuffed at 499 Third Street. Therefore, he should have been given his *Miranda* warnings at that time. He also alleges that his statements were involuntarily obtained after physical abuse inflicted by the detectives.

Evidence adduced at the suppression hearing revealed that 499 Third Street is a two-family house occupied entirely by the Davis family. The front entrance of the residence is accessed through a screen door and then a wooden door which opens into a common hallway. Davis's mother described the hallway as "a public hallway, open to anyone who wants to walk in off the street." Inside the hallway, stairs lead to a second floor apartment flat which was converted to a front bedroom for Davis. On August 1, 1996, the police detectives entered the residence through the closed, unlocked screen door and passed through the open interior door. They knocked on the first-floor door and a male resident informed them that defendant was upstairs. They proceeded to the second floor and knocked on the door. Defendant came to the door and, recognizing Detective Gustavo Flores, stepped out onto the landing and closed the door behind him. Flores asked defendant to come to the station to discuss something. Defendant agreed, but first went

back into the room to retrieve a jacket. The detectives never entered the second-floor room. The evidence further indicated that defendant asked to be handcuffed because he did not want people to think he was cooperating with the police. Flores refused, telling him he was not under arrest, but permitted him to put his hands together under his jacket, to look like he was handcuffed.

The detectives did not question defendant about the homicide on the ride to the station. Upon arrival, defendant was brought to an interview room. Flores remained with defendant, who was not handcuffed, shackled nor restrained. After a few minutes, the two other detectives entered the room. Detective Charles Mulrooney read defendant his *Miranda* warnings from a card and handed the card to him. He looked at it for a few seconds, indicated that he would talk to the detectives and initialed the card. Mulrooney and Detective Joseph Severance also initialed the card. Defendant was questioned and eventually made oral and written admissions to the detectives.

On the foregoing facts, we find that defendant did not have a reasonable expectation of privacy in the common hallway from the front door up to and outside the door of Davis's second-floor room (*see, Mauceri v County of Suffolk*, 234 AD2d 350, 350-351; *People v Maltese*, 149 AD2d 626, 626-627, *lv denied* 74 NY2d 743). Significantly, the detectives remained in the common area throughout the duration of their presence at 499 Third Street. Since they did not enter 499 Third Street to effect an arrest and did not intrude into defendant's "zone of privacy" (*Mauceri v County of Suffolk, supra*, at 351; *see, People v Dunn*, 77 NY2d 19, 25), neither an arrest warrant nor probable cause and exigent circumstances were required to support the entry (*see, Payton v New York*, 445 US 573). Furthermore, County Court did not err in determining that defendant was not in custody when he accompanied the police to the station "since a reasonable person, innocent of any crime, would not, under these circumstances, have believed himself or herself to be in custody" (*People v McCulloch*, 226 AD2d 848, 851, *lv denied* 88 NY2d 1070; *see, People v Centano*, 76 NY2d 837, 838; *People v Yukl*, 25 NY2d 585, 589, *cert denied* 400 US 851).

We also recognize that since County Court "saw and heard the witnesses, much weight is accorded to its determination" that defendant knowingly and voluntarily waived his *Miranda* rights (*People v Wright*, 286 AD2d 520, 521; *see, People v Prochilo*, 41 NY2d 759, 761). We note that defendant's contrary allegations set forth in his supplemental *pro se* brief are

unsupported by the record. Therefore, we find no error in County Court's denial of defendant's suppression motion.

We next address defendant's argument that County Court erred at trial in failing to admit for its truth, under the excited utterance exception to the hearsay rule, Davis's statement to Francine Vero that she killed Cassaro. County Court allowed Davis's statement to be admitted only as to Davis's credibility. "Excited utterances 'are the product of the declarant's exposure to a startling or upsetting event that is sufficiently powerful to render the observer's normal reflective processes inoperative' preventing the opportunity for deliberation and fabrication" (*People v Carroll*, 95 NY2d 375, 385, quoting *People v Vasquez*, 88 NY2d 561, 574; *see, People v Edwards*, 47 NY2d 493, 496-497). Some 15 hours elapsed from the murder of Cassaro until the telephone conversation between Davis and Vero. Although Davis testified that she was "numb" and in "shock" and had not slept during that time, she indicated that she believed she was "thinking clearly" after the murder. During the 15-hour interval, she moved the gun which defendant had left on top of her computer to a concealed location and moved the garbage bag into which defendant had placed Cassaro's wallet from her bedroom outside to the curb.

"Trial courts are accorded wide discretion in making evidentiary rulings and, absent an abuse of discretion, those rulings should not be disturbed on appeal" (*People v Carroll, supra*, at 385 [citation omitted]). On the facts before us, we cannot say that County Court abused its discretion in determining that Davis's statement to Vero was not an excited utterance.

Defendant additionally argues that the People opened the door to the admission of Davis's statement for its truth by eliciting her denial of the statement during her direct examination. However, defendant's failure to raise this argument before County Court precludes appellate review (*see, Carter v State of New York*, 284 AD2d 810, 811; *Williams v State of New York*, 235 AD2d 776, 777, *lv denied* 90 NY2d 806).

Next, defendant argues that the sentencing procedure of CPL 400.27 (1) deprives noncapital first degree murder defendants of their Federal and State constitutional rights to due process—because of the absence of sentencing criteria—and equal protection of the laws—since they are not entitled to a sentencing jury. CPL 400.27 (1) provides:

"Upon the conviction of a defendant for the offense of murder in the first degree as defined by section

125.27 of the penal law, the court shall promptly conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or to life imprisonment without parole pursuant to subdivision five of section 70.00 of the penal law. Nothing in this section shall be deemed to preclude the people at any time from determining that the death penalty shall not be sought in a particular case, in which case the separate sentencing proceeding shall not be conducted and the court may sentence such defendant to life imprisonment without parole or to a sentence of imprisonment for the class A-I felony of murder in the first degree other than a sentence of life imprisonment without parole."

Initially, the People argue that defendant's challenge to New York's sentencing scheme must be analyzed from an Eighth Amendment perspective because "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims' " (*Albright v Oliver*, 510 US 266, 273, quoting *Graham v Connor*, 490 US 386, 395; *see*, *Holman v Page*, 95 F3d 481, 485, *cert denied* 520 US 1254). The Eighth Amendment provides protection from "cruel and unusual punishments." It offers protection against the infliction of death in an arbitrary and capricious manner by affording criminal defendants certain procedural safeguards (*see, Gregg v Georgia*, 428 US 153) to ensure that death is not imposed "without an individualized determination that that punishment is 'appropriate' " (*Harmelin v Michigan*, 501 US 957, 995). However, under Federal law, the same requirements do not apply to defendants sentenced to life imprisonment without the possibility of parole (*see, id.*, at 995). "Because this is not a death penalty case, [we find that] defendant's * * * argument[s] should be measured by due process [and equal protection], not Eighth Amendment, standards" (*People v Couser*, 258 AD2d 74, 79, *affd* 94 NY2d 631).

Addressing the sentencing argument, in a noncapital first degree murder case, the judge presiding, rather than the jury, determines the defendant's sentence. The court may impose life without the possibility of parole or an indeterminate sentence with a maximum of life imprisonment and a minimum of no less than 20 years' imprisonment and no more than

25 years' imprisonment (*see*, Penal Law § 70.00 [3] [a] [i]). Neither CPL 400.27 nor any other statute provides aggravating or mitigating criteria for the court's use in determining the appropriate sentence in a noncapital first degree murder case. Defendant argues that due process requires, similar to a sentencing jury, that a sentencing court be provided with express criteria (*see*, CPL 400.27 [3], [9]; Penal Law § 125.27 [1] [a] [i]-[xii]). We disagree. Due process only requires that a sentencing court assure itself that the information relied upon when sentencing be "reliable and accurate" (*People v Outley*, 80 NY2d 702, 712; *see*, *People v Thomas*, 206 AD2d 708, 709). Moreover, unlike an experienced trial judge "who daily faces the difficult task of imposing sentences" (*Gregg v Georgia*, *supra*, at 190), "the members of a jury will have had little, if any, previous experience in sentencing" (*id.*, at 192). Therefore, it must be "given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision" (*id.*, at 192). We find that New York's sentencing scheme does not deprive those convicted of noncapital first degree murder of their Federal and State rights to due process.

We also find no merit to defendant's equal protection argument concerning the fact that defendants convicted of noncapital first degree murder are not sentenced by a jury. "The equal protection clause does not mandate absolute equality of treatment but merely prescribes that, absent a fundamental interest or suspect classification, a legislative classification be rationally related to a legitimate State purpose" (*People v Parker*, 41 NY2d 21, 25; *see*, *People v Walker*, 81 NY2d 661, 668).

Both defendant and the People acknowledge that there is no fundamental right to a sentencing jury and that defendants convicted of noncapital first degree murder are not members of a suspect class. Capital first degree murder defendants are treated differently from noncapital first degree murder defendants "because of the qualitative difference between death and all other penalties" (*Harmelin v Michigan*, 501 US 957, 995, *supra*). The penalty of death "is unique in its total irrevocability * * * its rejection of rehabilitation * * * [and] * * * its absolute renunciation of all that is embodied in our concept of humanity" (*Furman v Georgia*, 408 US 238, 306 [Stewart J., concurring]). Thus, " '[i]t is the universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations' " (*id.*, at 286 [Brennan, J., concurring], quoting *Griffin v Illinois*, 351

US 12, 28 [Burton and Minton, JJ., dissenting]). "Jury sentencing has been considered desirable in capital cases in order 'to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society" ' " (*Gregg v Georgia*, 428 US 153, 190, *supra*, quoting *Witherspoon v Illinois*, 391 US 510, 519 n 15, quoting *Trop v Dulles*, 356 US 86, 101). We, therefore, find that jury sentencing in capital first degree murder cases serves a legitimate State purpose and New York's sentencing scheme which reserves jury sentencing to death eligible defendants is rationally related to that purpose.

Next, defendant contends that his sentence of life without the possibility of parole was excessive. We have repeatedly held that " '[t]he imposition of the sentence rests within the sound discretion of the trial court, and we should not interfere unless there has been a clear abuse of discretion or extraordinary circumstances' " (*People v Simon*, 180 AD2d 866, 866, *lv denied* 80 NY2d 838, quoting *People v Harris*, 57 AD2d 663, 663). This was a brutal, senseless, murder. We cannot say that County Court abused its discretion nor do we find extraordinary circumstances warranting modification in the interest of justice (*see*, CPL 470.15 [6] [b]).

Finally, we have considered defendant's remaining contentions raised in his *pro se* supplemental brief and find that they are either unpreserved or lack merit.

CREW III, MUGGLIN, ROSE and LAHTINEN, JJ., concur.

Ordered that the judgment is affirmed.