**Edward SPREITZER, Petitioner–Appellee, Cross–Appellant,**

v.

**Howard A. PETERS, III, Director, Illinois Department of Corrections and Richard B. Gramley, Warden, Pontiac Correctional Center, Respondents–Appellants, Cross–Appellees.**

Nos. 96–1467, 96–1520.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 8, 1996.

Decided May 23, 1997.

---

Richard E. Cunningham (argued), Chicago, IL, Gary Prichard, Glen Ellyn, IL, for Petitioner-Appellee.

Steven J. Zick (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondents-Appellants in No. 96-1467.

Rita M. Novak, Office of the Attorney General, Chicago, IL, Steven J. Zick (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondents-Appellees in No. 96-1520.

Before BAUER, COFFEY, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Edward Spreitzer is a state prisoner who was sentenced to death in 1986. Spreitzer filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Illinois on March 31, 1992. He argued, among other things, that he was denied due process of law when, after the prosecution raised the issue of his future dangerousness at sentencing, the court refused to allow evidence of or instruct the jury that if the jury did not impose the death penalty, he faced a mandatory alternative sentence of life imprisonment without parole under Illinois law. On January 31, 1996, the district court granted the writ of habeas corpus on this issue for the purpose of resentencing only. The district court found that Spreitzer was entitled to habeas relief based on *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), which forbids the practice that occurred at Spreitzer's sentencing. The district court specifically held that Spreitzer was entitled to benefit from the Supreme Court's holding in *Simmons* because *Simmons* did not announce a "new rule" under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Respondents filed a notice of appeal from the district court's decision on February 27, 1996. Spreitzer filed a cross-appeal contesting the district court's denial of two other claims. We reverse the district court's holding that *Simmons* did not announce a "new rule," and we reject Spreitzer's remaining claims for relief.

## BACKGROUND

### I.

Spreitzer was convicted of five murders and admitted his involvement in four others. The gruesome details of the murders, which involved assault, rape, and dismemberment, can be found in the Illinois Supreme Court's decisions, *People v. Spreitzer,* 123 Ill.2d 1, 121 Ill.Dec. 224, 525 N.E.2d 30 (1988) ("*Spreitzer I*") and *People v. Spreitzer,* 143 Ill.2d 210, 157 Ill.Dec. 467, 572 N.E.2d 931 (1991) ("*Spreitzer II*"), so we do not republish them here. Instead, we discuss the facts only where they are relevant to the individual issues in this opinion. We move on to recite the procedural background here.

On March 4, 1986 in Du Page County, Spreitzer was found guilty of the aggravated kidnapping and murder of Linda Sutton. After a bench trial, the State of Illinois requested a jury to impose the death penalty because of Spreitzer's four previous murder convictions. At a separate sentencing hearing, the jury found insufficient mitigating factors and sentenced Spreitzer to death. The Illinois Supreme Court affirmed the convictions and the death sentence on direct appeal (*Spreitzer I*), and the United States Supreme Court denied Spreitzer's petition for certiorari. *See Spreitzer v. Illinois,* 488 U.S. 917, 109 S.Ct. 274, 102 L.Ed.2d 263 (1988).

Spreitzer filed a *pro se* petition for post-conviction relief under the Illinois Post-Conviction Hearing Act. *See* 725 ILCS 5/122-1. The trial court appointed Terry Ekl to represent Spreitzer for his post-conviction petition, but denied his amended petition on October 24, 1989, after hearing oral argument but

without an evidentiary hearing. The Illinois Supreme Court affirmed the denial of Spreitzer's post-conviction petition (*Spreitzer II*) and set Spreitzer's execution for September 18, 1991. The United States Supreme Court again denied Spreitzer's petition for certiorari. *See Spreitzer v. Illinois*, 502 U.S. 985, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991). Spreitzer then filed a petition for a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254. With the benefit of new attorneys, he filed an amended petition on November 23, 1994. His execution was stayed pending resolution of the habeas petition. On January 31, 1996, the district court granted the petition as to the death sentence only and ordered Spreitzer to be resentenced within 120 days in a manner comporting with the due process requirements of the Fourteenth Amendment. *See United States ex rel. Spreitzer v. Peters*, No. 92 C 2182, 1996 WL 48585 (N.D.Ill. Feb.5, 1996). The district court denied relief on other sentencing and trial issues.

## II.

The district court's January 31, 1996 order granted the writ of habeas corpus solely on the issue of whether Spreitzer was denied due process of law when, at sentencing, the State placed the issue of Spreitzer's future dangerousness before the jury, and the trial judge refused to allow Spreitzer to inform or instruct the jury that if the jury did not sentence Spreitzer to death, Spreitzer would nonetheless be ineligible for parole. During the sentencing hearing, the prosecution elicited testimony from a clinical psychologist that Spreitzer was "resentful of authority," had "some potential for dangerousness" and "could still be dangerous." During rebuttal closing argument, the prosecutor told the jury that "Mr. Spreitzer, even by his own doctor who came in, is a very, very dangerous person" and that "people in your community have a right to live free from the fear of guys like Edward Spreitzer" and "a right to feel secure in their homes and on their streets." The trial judge refused to allow Spreitzer's trial attorney, Carol Anfinson, to put the Du Page County Public Defender, Peter Dockery, on the stand to testify as to Illinois law's mandatory alternative sentence of life imprisonment without parole, which would render Spreitzer ineligible for parole if the jury did not sentence him to death. *See* 730 ILCS 5/5–8–1. The trial judge never instructed the jury that Spreitzer would be ineligible for parole in the event that the jury did not return a death sentence.

At the time of his sentencing hearing, Illinois law did not require the trial judge to instruct the jury on the alternative mandatory sentence of natural life. *Spreitzer I*, 123 Ill.2d at 43, 121 Ill.Dec. at 242, 525 N.E.2d at 48 (citing *People v. Albanese*, 102 Ill.2d 54, 81, 79 Ill.Dec. 608, 621–22, 464 N.E.2d 206, 219–20 (1984) and *People v. Stewart*, 105 Ill.2d 22, 70–71, 85 Ill.Dec. 241, 265, 473 N.E.2d 840, 864 (1984)). However, it is now established both under the Due Process Clause of the Fourteenth Amendment and under Illinois law that if the defendant's future dangerousness is placed in issue, and the jury is not informed of the defendant's ineligibility for parole, the Due Process Clause is violated. *Simmons v. South Carolina*, 512 U.S. 154, 156, 114 S.Ct. 2187, 2190, 129 L.Ed.2d 133 (1994) (plurality opinion); *People v. Gacho*, 122 Ill.2d 221, 256–63, 119 Ill.Dec. 287, 303–07, 522 N.E.2d 1146, 1162–66, *cert. denied*, 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988).

In *Simmons v. South Carolina*, as in this case, the state put the issue of the defendant's future dangerousness before the jury, but the trial judge refused to instruct the jury that the defendant was ineligible for parole. 512 U.S. at 156–61, 114 S.Ct. at 2190–93. The prosecutor argued during closing argument that a sentence of death would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." *Id.* at 157, 114 S.Ct. at 2190–91. During deliberations, the jury sent a note to the judge asking whether "the imposition of a life sentence carr[ied] with it the possibility of parole[.]" *Id.* at 160, 114 S.Ct. at 2192. The judge instructed the jury "not to consider parole or parole eligibility" in reaching its verdict, and twenty-five minutes later, the jury returned a sentence of death. *Id.* A plurality of the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defen-

dant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156, 114 S.Ct. at 2190. The plurality concluded its opinion by stating: "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole." *Id.* at 171, 114 S.Ct. at 2198.

On direct appeal in this case, the Illinois Supreme Court indicated that "[a]t the time of the sentencing hearing, it was the law of Illinois that the trial court was not required to instruct a jury on the alternative mandatory sentence of natural life." *Spreitzer I*, 123 Ill.2d at 43, 121 Ill.Dec. at 242, 525 N.E.2d at 48 (citing *Albanese and Stewart*). The Court indicated that *People v. Gacho*, 122 Ill.2d 221, 260, 119 Ill.Dec. 287, 305, 522 N.E.2d 1146, 1164 (1988) changed that rule, but that the *Gacho* rule was prospective only, and therefore was inapplicable. The Court concluded that the trial court's failure to permit evidence of sentencing alternatives was not error, and the failure of defense counsel to tender such an instruction was not incompetent "for the obvious reason that the trial court could properly have refused such an instruction prior to our decision in *Gacho*." *Spreitzer I*, 123 Ill.2d at 44, 121 Ill.Dec. at 242, 525 N.E.2d at 48.

In granting the writ of habeas corpus, the district court determined that the rule announced in *Simmons* was not "new" for purposes of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and that Spreitzer was therefore entitled to the benefit of that rule. Respondents appealed from that decision on February 27, 1996. Spreitzer filed a cross-appeal on March 1, 1996, contesting the denial of two other grounds for relief. First, Spreitzer argues that the trial court improperly refused to inquire into an alleged conflict of interest by his defense counsel. Second, he contends that the district court erred in failing to conduct an evidentiary hearing as to an ineffective assistance of counsel claim. We reverse the district court's grant of habeas corpus on the

sentencing issue, and affirm the denial of relief on the cross-appeal.

## ANALYSIS

### I.

On April 24, 1996, while this case was pending, President Clinton signed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. No. 104–132, 110 Stat. 1214. The AEDPA amended the habeas statute, 28 U.S.C. § 2254, and this Court decided in *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996) (en banc), *cert. granted*, —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997), that the new provisions apply to pending cases. *See also Bocian v. Godinez*, 101 F.3d 465, 471 (7th Cir.1996) (citations omitted). *But see Hall v. Washington*, 106 F.3d 742, 748 (7th Cir.1997) (showing disagreement among circuits on the issue of retroactivity). Because the issue is currently before the Supreme Court, and the Court may disagree with our resolution of it, we decide the issues in this case based on the amended statute, but also give careful consideration to our old *de novo* standard of review. *See Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir.1997).

As amended, the new § 2254(d) authorizes the issuance of a writ of habeas corpus only if the challenged decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). The amended statute "requires federal courts 'to give greater deference to the determinations made by state courts than they were required to do under the previous law.'" *Ford v. Ahitow*, 104 F.3d 926, 936 (7th Cir.1997) (citing *Emerson v. Gramley*, 91 F.3d 898, 900 (7th Cir.1996)).

Although the parties in this case did not thoroughly address the requirements of the new habeas statute, the asserted errors here all involve allegedly unreasonable applications of federal law under § 2254(d)(1). The new § 2254(d)(1) requires us to answer

the "more subtle" question of whether the state court "unreasonably" applied clearly established federal law *as the Supreme Court has determined it. Hall,* 106 F.3d at 748. We have recently explained that the criterion for determining the "reasonableness" of an application of Supreme Court law is "whether the determination [the application] is at least minimally consistent with the facts and circumstances of the case." *Hennon,* 109 F.3d at 335. "The statutory 'unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes." *Hall,* 106 F.3d at 748–49. Despite the fact that the amended statute places a higher burden on Spreitzer to show that the state court made a mistake than the previous law did, we believe that Spreitzer will not be entitled to relief on any of the issues raised in this appeal even if it turns out that the AEDPA does not apply to pending cases. Thus, we need not await the Supreme Court's decision in *Lindh* to decide this case. *Cf. Hall,* 106 F.3d at 749.

## II.

■■■ Respondents argue that the district court erred in determining that Spreitzer was entitled to a retroactive application of *Simmons v. South Carolina.* As a general rule, "[t]he nonretroactivity principle *prevents* a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). Thus, we first determine whether we are required to follow the rule in *Teague v. Lane* that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). As Justice O'Connor explained in *Teague,* a case announces a new rule if it breaks new ground, imposes a new obligation on the States or the Federal Government, or if the result was not *dictated* by precedent

existing at the time the defendant's conviction became final. *Id.* at 301, 109 S.Ct. at 1070 (cited in *Graham v. Collins,* 506 U.S. 461, 467, 113 S.Ct. 892, 897–98, 122 L.Ed.2d 260 (1993)); *see also Stewart v. Lane,* 60 F.3d 296, 300 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2580, 135 L.Ed.2d 1095 (1996).[1]

In *Caspari v. Bohlen,* the Supreme Court identified a three-step analysis for applying *Teague* to determine if a case announced a new rule:

> First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must survey the legal landscape as it then existed and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution. Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle.

510 U.S. at 390, 114 S.Ct. at 953 (citations, internal quotations and alterations omitted). We will apply these rules to see if Spreitzer is entitled to benefit from the rule announced in *Simmons.* We assume, without so holding, that applying *Simmons* would indeed dictate a different result in this case. *See, e.g., Stewart,* 60 F.3d at 299.

### A. Finality.

■■■ "A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Stewart,* 60 F.3d at 300 (citing *Caspari,* 510 U.S. at 390, 114 S.Ct. at 953–54); *see also Griffith v.*

---

1. *Teague* is not a jurisdictional rule that federal courts must apply *sua sponte,* but, rather, if the State argues that the defendant is seeking the benefit of a "new rule," the court must apply *Teague* before considering the merits of a claim.

*Caspari,* 510 U.S. at 389, 114 S.Ct. at 952–53. Respondents in this case have indeed argued that Spreitzer is seeking the benefit of a new rule, and therefore we are free to consider *Teague.*

*Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987). Spreitzer's conviction and sentence became final when the United States Supreme Court denied certiorari on his direct appeal on October 17, 1988. *See Spreitzer v. Illinois,* 488 U.S. 917, 109 S.Ct. 274, 102 L.Ed.2d 263 (1988).

### B. The Legal Landscape.

We proceed to the second step in the *Teague* analysis. We must survey the legal landscape as it existed on October 17, 1988 and determine whether reasonable jurists would have felt compelled by existing precedent on that date to conclude that the rule announced in *Simmons* was required by the Constitution. *See Graham,* 506 U.S. at 467, 113 S.Ct. at 897–98.

In a thorough and well-reasoned manner, one of our sister circuits has recently conducted this same survey and concluded that reasonable jurists would not have felt so compelled. *O'Dell v. Netherland,* 95 F.3d 1214, 1224–38 (4th Cir.1996) (en banc), *cert. granted in part,* — U.S. —, 117 S.Ct. 631, 136 L.Ed.2d 552 (Dec. 17, 1996).[2] The Fourth Circuit in *O'Dell* held that *Simmons* was a "new rule" under *Teague* and could not be retroactively applied. *Id.* at 1239; see also *Johnson v. Scott,* 68 F.3d 106, 111 n. 11 (5th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1358, 134 L.Ed.2d 525 (1996) (determining that *Simmons* announced a "new rule" and could not be retroactively applied).

We conducted a truncated version of this legal survey in *Stewart v. Lane,* 60 F.3d 296, 300–02 (7th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 2580, 135 L.Ed.2d 1095 (1996). In *Stewart,* we examined the legal landscape as of May, 1985, and concluded that *Simmons* was a "new rule" for purposes

of *Teague* in that it was not dictated by existing precedent as of that date. We therefore concluded that *Simmons* could not be retroactively applied to collateral habeas petitioners. As we discussed in *Stewart,* *Simmons* relied primarily on *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) and *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) in reaching its holding. In *Stewart,* however, because the relevant date of inquiry was 1985, the petitioner was unable to use *Skipper* to argue that *Simmons* did not create a "new rule," because the Supreme Court decided *Skipper* eleven months after Stewart's conviction became final. *Stewart,* 60 F.3d at 300–01. In *Stewart,* the relevant question was "whether *Simmons* was compelled by precedent other than *Skipper,* specifically *Gardner.*" *Id.* at 301. We determined that "[t]he fact that *Gardner* lends general support to the conclusion reached in *Simmons* does not mean that state courts should have predicted *Simmons* as a further development in Due Process jurisprudence," *id.,* and that "the broad principles announced in *Gardner* thus laid the foundation for *Simmons,* but they are at too high a level of generality to compel it." *Id.* at 301.[3] We explicitly noted in a footnote in *Stewart,* however, that we might have had a different case if Stewart's conviction had become final after the Supreme Court decided *Skipper,* because it was arguable that *Skipper* compelled the result in *Simmons.* *Id.* at 302 n. 4. We said, however, that "[g]iven the timing of Stewart's convictions and Supreme Court decisions, we [would] not visit that question." *Id.* Because Spreitzer's conviction *did* become final after 1986 when the Supreme Court decided *Skipper,* we face that exact case now. Respondents argue that the footnote in *Stewart* was mere dicta, and that

---

**2.** The district court opinion granting the writ of habeas corpus on the *Simmons* issue relied on a lower court opinion that was reversed in *O'Dell.* *See United States ex rel. Spreitzer v. Peters,* No. 92 C 2182, 1996 WL 48585 (N.D.Ill. Feb. 5, 1996), at *6 (citing *O'Dell v. Thompson,* No. 3:92 CV 480, slip op. at 59 (E.D.Va. Sept. 6, 1994)).

**3.** In *Stewart,* we addressed the Illinois Supreme Court's decision in *Gacho.* We found that *Gacho* relied entirely on state law in reaching its result, and that state law errors could not provide a

basis for habeas relief. 60 F.3d at 302 (citing *Gilmore v. Taylor,* 508 U.S. 333, 344–46, 113 S.Ct. 2112, 2119, 124 L.Ed.2d 306 (1993)). We indicated that there was no hint in *Gacho* that the Illinois Supreme Court was deciding the case on Due Process grounds, that the *Gacho* court made the rule of the case prospective only, and that *Gacho* therefore prohibited its own application to Stewart's case. *Id.* We adopt that reasoning and conclusion in this case as well.

*Skipper*, viewed in conjunction with *Gardner*, did not compel *Simmons* either. We agree with Respondents.

Spreitzer argued to the district court that *Skipper* and *Gardner*, the central cases relied upon by the plurality in *Simmons*, compelled the Court's due process holding. The district court, seizing on the footnote in *Stewart*, concluded that "*Skipper*, viewed in combination with *Gardner*, did announce the due process principles that dictated the result in *Simmons*, and should have guided the Illinois courts in their decisions concerning Spreitzer's death sentence." As the district court did, we discuss the two cases in chronological order to follow the progression of the Court's jurisprudence.

*Gardner* was decided on due process grounds. In *Gardner*, the Supreme Court held that "the petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977). Gardner was convicted of first-degree murder in a Florida trial court. The jury recommended a life sentence, but the trial judge disregarded this recommendation and sentenced Gardner to death. In imposing the death penalty, the trial judge stated that he was relying in part on confidential information contained in a presentence investigation report (PSI) which was not available to the parties. The Supreme Court of Florida affirmed the death sentence without reviewing the confidential part of the PSI.

A plurality of the Supreme Court said that "this procedure does not satisfy the constitutional command that no person shall be deprived of life without due process of law." *Id.* at 351, 97 S.Ct. at 1201. The Court vacated Gardner's death sentence, holding that the Florida trial court had failed to follow fundamental procedures required prior to imposing the death penalty. *Stewart*, 60 F.3d at 301 (citing *Gardner*, 430 U.S. at 358, 361, 97 S.Ct. at 1204–05, 1206; id. at 363, 97 S.Ct. at 1207 (White, J., concurring)).

The plurality distinguished *Gardner* from *Williams v. People of New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), by pointing out that in *Williams*, the judge had relied on information in a PSI that was also described in detail by the trial judge in open court, so that petitioner's counsel could challenge the accuracy or materiality of any such information. *Gardner*, 430 U.S. at 356, 97 S.Ct. at 1203–04. The Supreme Court also pointed out that since the *Williams* decision, which was written in 1949, the Court "has acknowledged its obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society." *Id.* at 357, 97 S.Ct. at 1204. The Court noted that, as of the date *Gardner* was decided, five Members of the Court had expressly recognized that death is a "different" kind of penalty, and that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. *Id.* at 357–58, 97 S.Ct. at 1204–05.

As we explained in *Stewart v. Lane*, *Gardner* is not a case that compels *Simmons* because of the factual confines in *Gardner*. When the Court said "confidential information" in *Gardner*, the Court was referring to discrete information which is factually relevant as an aggravating or mitigating factor and which is not disclosed to the defendant or his counsel. *Id.* at 358, 97 S.Ct. at 1204–05. The Court was not referring to legal or procedural information of which, for some reason, whether it be lack of diligence, lack of familiarity with sentencing procedures, or lack of interest, someone involved in the case was unaware. As we clearly stated in *Stewart*, although the Court relied on *Gardner* in *Simmons*, and *Simmons* clearly emerges from the teachings of *Gardner*, "[t]his nexus is not sufficient ... to lift [petitioner] over the hurdle erected by *Teague* and elevated by its progeny." *Stewart*, 60 F.3d at 301.

The next logical question, which we must answer today, is whether the *combination of Gardner* and *Skipper* compels *Simmons*. The Fourth Circuit answered this question in the negative in *O'Dell*, and we also do not find that the *Gardner/Skipper* line of cases compels *Simmons*.

In contrast to the due process foundation of *Gardner*, *Skipper's* foundation was the

Eighth Amendment. In *Skipper v. South Carolina*, the Supreme Court held that a petitioner's death penalty must be reversed because testimony the petitioner proffered regarding his good behavior in jail was excluded from the sentencing hearing, thus preventing the petitioner from presenting relevant evidence in mitigation of punishment. 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986). The Court found this to be violative of its previous Eighth Amendment holdings in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The Court was careful to note in *Skipper* that the Eighth Amendment issue was "the only question before [it]" and that it had granted certiorari only to determine "whether, under the Eighth Amendment, the lower court's decision was 'inconsistent with th[e] Court's decisions in *Lockett* and *Eddings*.'" *O'Dell*, 95 F.3d at 1225 (citing *Skipper*, 476 U.S. at 4, 106 S.Ct. at 1670–71).

Although the Court specifically noted that it was deciding the case based on the fact that the sentencer could not be precluded from considering "any relevant mitigating evidence" presented by a defendant, (*Skipper*, 476 U.S. at 4, 106 S.Ct. at 1671) the Court also noted in a footnote:

> Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* [two Eighth Amendment decisions] that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977).

*Skipper*, 476 U.S. at 5 n. 1, 106 S.Ct. at 1671 n. 1. Although this footnote clearly indicates that the Court considered the due process implications of such conduct, it is also evident that the Court did not decide *Skipper* on the basis of *Gardner*, nor was *Skipper* the logical extension of *Gardner*. *See also O'Dell*, 95 F.3d at 1225. As Respondents argue in their brief, "This fleeting reference to *Gardner* is hardly persuasive authority for deeming *Skipper* a due process parent of *Simmons* so as to avoid *Teague*." In fact, as evidence that the *Skipper* majority did not intend to decide the case solely on the basis of *Gardner*, Justice Powell, joined by Chief Justice Burger and then-Justice Rehnquist, concurred in the judgment in *Skipper* specifically to note that he believed the case should have been decided solely on the basis of *Gardner*. The concurrence stated: "I would reverse ... because petitioner was not allowed to rebut evidence and argument used against him." 476 U.S. at 9, 106 S.Ct. at 1673 (Powell, J., concurring). The *Skipper* majority could have joined in this point, but did not.

As Respondents point out, it is, of course, not to be ignored that in *Simmons* the Supreme Court referred to its decision in *Skipper* by saying that "the Court's conclusion [in *Skipper*] also was compelled by the Due Process Clause" and "[t]he principle announced in *Gardner* was reaffirmed in *Skipper*, and it compels our decision today." *Simmons*, 512 U.S. at 164–65, 114 S.Ct. at 2194. But in *Stewart v. Lane*, we addressed this language by pointing out that "the fact that a court says its decision is controlled by a prior holding is not conclusive or dispositive for the purposes of deciding whether the relevant decision is a new rule under *Teague*." *Stewart*, 60 F.3d at 301 n. 3 (citing *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217–18, 108 L.Ed.2d 347 (1990)).

In *Simmons*, the Supreme Court stated:

> In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the State's repeated suggestion that petitioner would pose a future danger to society if he

were not executed.... The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.

*Simmons*, 512 U.S. at 161–62, 114 S.Ct. at 2193. Following this paragraph, the Court stated in a footnote: "We express no opinion on the question whether the result we reach today is also compelled by the Eighth Amendment." *Id.* at 162 n. 4, 114 S.Ct. at 2193 n. 4.

In any case, neither *Skipper* nor *Gardner* dealt with instructions to the jury about the kind of post-sentencing contingencies that were at issue in *Simmons*. "The *Gardner* court was not concerned with the substance of the confidential report; the procedural unfairness in its secrecy alone was enough to render its use unconstitutional." *Stewart*, 60 F.3d at 301. We expand our holding in *Stewart v. Lane* to encompass *Skipper* as well as *Gardner*. The fact that *Gardner* and *Skipper* lend general support to the conclusion reached in *Simmons* does not mean that state courts should have predicted *Simmons* as a further development in due process jurisprudence. *See Stewart*, 60 F.3d at 301.

In addition, as the Fourth Circuit noted in *O'Dell*, if *Gardner* and *Skipper* made up the totality of the legal landscape in 1988, "the claim that *Simmons* was not a new rule might, at least at first blush, have considerable force." *O'Dell*, 95 F.3d at 1225. However, a reasonable jurist surveying the legal landscape in 1988 would also have been confronted with *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), which the Supreme Court decided between *Gardner* and *Skipper*. *Ramos* factored heavily into the Fourth Circuit's extensive discussion in *O'Dell* and led to its conclusion that *Simmons* announced a "new rule." *O'Dell*, 95 F.3d at 1225–29. The district court in this case did not address *Ramos* when it determined that *Gardner* and *Skipper* compelled *Simmons*.

In *Ramos*, the Supreme Court determined that there was not a constitutional infirmity under either the Eighth or the Fourteenth Amendment in "instructing a capital sentencing jury regarding the Governor's power to commute a sentence of life without possibility of parole." *Ramos*, 463 U.S. at 994, 103 S.Ct. at 3449. At the time, California law required the trial judge to instruct the jury on aggravating and mitigating circumstances and that a sentence of life imprisonment without the possibility of parole could be commuted by the Governor to a sentence that includes the possibility of parole. The trial judge in *Ramos* gave this instruction, and the jury returned a verdict of death. The California Supreme Court affirmed the conviction but reversed the death sentence, concluding that the instruction violated the Constitution. The United States Supreme Court reversed, finding the instruction did not violate the Eighth Amendment, in light of the Court's previous limitations on the factors which a sentencing jury could consider in determining whether death was an appropriate sentence.

Later descriptions of *Ramos* suggest that reasonable jurists interpreting *Ramos* could have viewed it as a case that gave states discretion in this area. In *Simmons*, the Supreme Court described *Ramos* as a case which "stands for the broad proposition that we generally will defer to a State's determination as to what a jury should and should not be told about sentencing." *Simmons*, 512 U.S. at 168, 114 S.Ct. at 2196. In her *Simmons* concurrence, Justice O'Connor described *Ramos* as being a previous approval of the practice that "[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole." *Simmons*, 512 U.S. at 176, 114 S.Ct. at 2200 (O'Connor, J., concurring) (citing *Ramos*, 463 U.S. at 1013 n. 30, 103 S.Ct. at 3460 n. 30). Justice Scalia's dissent in *Simmons* quoted *Ramos* as saying: "[T]he wisdom of the decision to permit juror consideration of [postsentencing contingencies] is best left to the States." *Simmons*, 512 U.S. at 183, 114 S.Ct. at 2204 (Scalia, J., dissenting) (citing *Ramos*, 463 U.S. at 1014,

103 S.Ct. at 3460). As of the date of *Ramos*, state courts could reasonably have thought that they could use their own discretion in determining whether sentencing juries in capital cases must or should hear post-sentencing statutory contingencies. That is, state courts would not necessarily have believed that such instructions were either required or prohibited.[4]

In addition to the Fourth Circuit's reliance on *Ramos* in *O'Dell*, the Fifth Circuit relied exclusively on *Ramos* when it determined that *Simmons* announced a "new rule." *Johnson v. Scott*, 68 F.3d 106, 111–12 n. 11 (5th Cir.1995). The court stated: "*Simmons* did announce a new rule because it held that in some situations the states are no longer free to decide whether an instruction on parole should be given. This is inconsistent with the Court's earlier ruling in *California v. Ramos*.... Therefore, even if *Simmons* applied to [petitioner's] case, it would still be barred by *Teague*." *Id.* (citation omitted).

Now that we have set out the conflicting views in the landscape that a reasonable jurist would have faced on October 17, 1988, we note some of the Supreme Court's own statements about "new rules" under *Teague*. The Court stated in *Graham*: "While there can be no dispute that a decision announces a new rule if it expressly overrules a prior decision, 'it is more difficult ... to determine whether we announce a new rule when a decision extends the reasoning of our prior cases.'" *Graham*, 506 U.S. at 467, 113 S.Ct. at 897 (citing *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)). The Court also said: "The result in a given case is not dictated by precedent if it is susceptible to debate among reasonable minds, or, put differently, if reasonable jurists may disagree." *Graham*, 506 U.S. at 476, 113 S.Ct. at 902 (quoting *Stringer v. Black*, 503 U.S. 222, 238, 112 S.Ct. 1130, 1141, 117 L.Ed.2d 367 (1992) (Souter, J., dissenting)).

In light of the arguably conflicting line of Supreme Court cases, we conclude that on October 17, 1988, reasonable jurists certainly could have disagreed over whether the legal landscape was such that a sentencing jury must be informed that a defendant will not be back on the street if he is not sentenced to death. We do not believe that *Simmons* created the kind of rule that was "compelled" by the entirety of the legal landscape existing at the time of its pronouncement. As the Supreme Court noted in *Graham*, "Because the leading purpose of federal habeas review is to ensur[e] that state courts conduct criminal proceedings in accordance with the Constitution as interpreted at the time of th[ose] proceedings, [t]he 'new rule' principle ... validates reasonable, good-faith interpretations of existing precedents made by state courts." 506 U.S. at 467, 113 S.Ct. at 897–98 (citing *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990)). The Illinois trial court made a good-faith interpretation of existing precedent during Spreitzer's sentencing. The trial court did not proceed in a manner that was either contrary to, or an unreasonable application of, clearly established Federal law as determined by the United States Supreme Court. *See also O'Dell*, 95 F.3d at 1237–38. Alternatively, if the Supreme Court determines that the AEDPA does not apply to pending cases, we hold, in our *de novo* review under those circumstances, that the Illinois courts reached this issue on the merits and did not err in their conclusion.

In sum, we conclude, like the Fourth and Fifth Circuits, that *Simmons* announced a "new rule" under *Teague*, and that Spreitzer was not entitled to benefit from the rule announced in *Simmons* on habeas review. The district court therefore erred in applying *Simmons* to Spreitzer's case.

### C. The Exceptions to Teague.

Finally, we must determine whether either of the two narrow exceptions

---

4. Although Spreitzer argues that *Ramos* is not necessarily inconsistent with either *Gardner* or *Skipper*, he misses the point of both the *Teague* analysis and the analysis under the new 28 U.S.C. § 2254(d). The question is not whether the cases can somehow be theoretically reconciled. The relevant questions, rather, are whether, under *Teague*, courts would have felt *compelled* by the precedent to act in certain ways, and whether, under the new § 2254(d)(1), a state court's applications of a rule were at least minimally consistent with the facts and circumstances of the case.

to the *Teague* rule apply. Neither party has contended that either of the exceptions have any relevance to this case. The first exception deals with new rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Caspari*, 510 U.S. at 396, 114 S.Ct. at 956 (citing *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073–74). This exception also applies if a rule addresses a substantive categorical guarantee accorded by the Constitution such as a rule "prohibiting a certain category of punishment for a class of defendants because of their status or offense." *O'Dell*, 95 F.3d at 1238 (citing *Saffle v. Parks*, 494 U.S. 484, 494, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990)). The first exception clearly is not relevant here, and was summarily dismissed in both *O'Dell* and *Stewart*. In *O'Dell*, the exception was found to be inapplicable because the rule announced in *Simmons* neither decriminalizes a class of conduct nor prohibits the imposition of capital punishment on a particular class of persons because of their status or offense. *O'Dell*, 95 F.3d at 1238–39.

■ The second exception is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Caspari*, 510 U.S. at 396, 114 S.Ct. at 956 (citing *Saffle*, 494 U.S. at 495, 110 S.Ct. at 1263–64). This exception "is clearly meant to apply only to a small core of rules requiring observance of those procedures that ... are implicit in the concept of ordered liberty." *O'Dell*, 95 F.3d at 1239 (citing *Graham*, 506 U.S. at 478, 113 S.Ct. at 903). The *O'Dell* court and our panel in *Stewart* both concluded that the rule announced in *Simmons* was not such a rule, and did not alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding. *O'Dell*, 95 F.3d at 1239; *Stewart*, 60 F.3d at 302–03. We concur in those conclusions that the second exception also does not apply to the rule announced in *Simmons*. We therefore reiterate that *Simmons* announced a "new rule" for purposes of *Teague* and Spreitzer may not receive the benefit of the rule in *Simmons*.

## III.

### A. Conflict of Interest.

Spreitzer has two arguments on cross-appeal, neither of which provides grounds for relief. First, Spreitzer contends, as he did on direct appeal, that his Sixth Amendment right to effective assistance of counsel was violated because the trial court did not inquire into a possible conflict of interest by defense counsel. *See Spreitzer I*, 123 Ill.2d at 11–23, 121 Ill.Dec. 224, 525 N.E.2d at 33–38.

In 1984, when he was indicted for Linda Sutton's murder, Spreitzer's original defense counsel was Frank Wesolowski, the Public Defender of Du Page County. Wesolowski assigned Assistant Public Defender Edward Ward to Spreitzer's case. Ward worked on the case until he resigned from his position as an Assistant Public Defender. Ward informed the trial court on June 4, 1985 of his resignation, but indicated that he would continue representing Spreitzer until the Public Defender's Office hired a replacement. On June 18, 1985, Wesolowski himself appeared before the trial court and told the court he was assigning Assistant Public Defender Carol Anfinson to the case, but that she could not handle the case for several months because of her workload. When the trial court asked Wesolowski if he could temporarily assign another Assistant for pre-trial motions, Wesolowski told the court and the prosecutor, Brian Telander, that he had just hired Peter Dockery to replace Ward as an Assistant Public Defender. The following conversation then took place:

MR. WESOLOWSKI: Judge, perhaps a conference—I employed a new attorney who is very capable to handle this, but I understand that a couple of years ago when he was employed in the State's Attorney's Office, he handled some matters in this case. So he would not be able to handle it. The State would object to that.

MR. TELANDER: He is talking about Pete Dockery, and he was very much involved in the decision to charge Mr. Spreitzer. Since it is a capital case, we think there would be such a conflict of interest

that the Supreme Court, should it get that far, would look at it—

THE COURT: I would have him withdraw from the case anyway based upon that information. Why don't we do this. I'll continue—without the defendant's presence being required—to June 27th to have a determination as to who will be assigned the matter and what their schedule will be.

Ward continued to represent Spreitzer by special appointment. On September 23, 1985, Ward was allowed to withdraw, and the Public Defender's Office again was appointed to represent Spreitzer, with an appearance filed by Anfinson. In January 1986, Wesolowski resigned as the Public Defender, and by early-February 1986, prior to the start of Spreitzer's trial, Assistant Public Defender Dockery had become the Du Page County Public Defender. This meant that Dockery's name appeared on pre-trial motions and pleadings as Spreitzer's lead defense counsel, although Anfinson continued to represent Spreitzer in court.[5] Spreitzer argues that both Dockery and Anfinson had a conflict of interest because Dockery had previously been involved as a prosecutor against Spreitzer in the same proceeding and because Dockery was Anfinson's supervisor.

On direct appeal, the Illinois Supreme Court rejected this issue after addressing it thoroughly. See Spreitzer I, 123 Ill.2d at 11–23, 121 Ill.Dec. at 227–32, 525 N.E.2d at 33–38. The court assumed that Spreitzer's argument centered on the possible existence of a conflict in cases where Dockery had some previous prosecutorial involvement, but the court rejected the argument. Spreitzer I, 123 Ill.2d at 19, 121 Ill.Dec. at 231, 525 N.E.2d at 37. The court held that "insofar as the defendant's claim is premised upon the mere employment of Dockery as an assistant public defender, it does not assert a per se conflict." Spreitzer I, 123 Ill.2d at 22, 121 Ill.Dec. at 232, 525 N.E.2d at 38.[6] The court further found that Dockery's employment as the Public Defender, and therefore as Anfinson's boss, did not create a per se conflict either because "Dockery's tie to the prosecution, a tie which was itself fairly tenuous, would be counterbalanced by his present status as the public defender. Presumably he was more interested in winning cases currently assigned to his office than in protecting the integrity of the decisions he had made when he was a prosecutor." Spreitzer I, 123 Ill.2d at 22, 121 Ill.Dec. at 232, 525 N.E.2d at 38. The Illinois Supreme Court concluded:

Since there was no per se conflict it remains to be determined whether there was a potential conflict brought to the attention of the court or an actual conflict demonstrated by the performance of counsel at trial. Clearly, the potential conflict was not brought to the attention of the court. Anfinson made no motions for appointment of separate counsel after Dockery became the public defender and never raised the issue in any other form.

Id.

On habeas review, the district court also rejected this claim, concurring with the Illinois Supreme Court's conclusion. The dis-

---

**5.** Dockery's name typically appeared in pleadings indicating that the pleading was brought on Mr. Spreitzer's behalf, "by his attorney, Peter J. Dockery, Public Defender for Du Page County, through his assistant Carol Anfinson" or "by Carol Anfinson his Deputy." The end of the motions indicated that they were submitted from "Peter J. Dockery, Public Defender for Du Page County, by Carol Anfinson, Deputy Public Defender."

**6.** In Spreitzer I, the Illinois Supreme Court described a class of cases that Illinois jurisprudence labels "per se" conflict cases. Spreitzer I, 123 Ill.2d at 14–16, 121 Ill.Dec. at 228–29, 525 N.E.2d at 34–35 (citing cases). In these cases, "certain facts about 5. defense attorney's status were held to engender, by themselves, a disabling conflict." Spreitzer I, 123 Ill.2d at 14, 121 Ill.

Dec. at 228, 525 N.E.2d at 34. The Illinois Supreme Court explained, "The justification for treating these conflicts as per se has been that the defense counsel in each case had a tie to a person or entity—either counsel's client, employer, or own previous commitments-which would benefit from an unfavorable verdict for the defendant." Spreitzer I, 123 Ill.2d at 16, 121 Ill.Dec. at 229, 525 N.E.2d at 35; see also People v. French, 210 Ill.App.3d 681, 688, 155 Ill.Dec. 457, 569 N.E.2d 934, 939 (2d Dist.1991) ("Our supreme court has held that a per se conflict of interest exists in a criminal case if defendant's attorney has a tie to an entity which would benefit from a verdict unfavorable to defendant.") (citing Spreitzer I, 123 Ill.2d at 16, 121 Ill.Dec. at 229, 525 N.E.2d at 35).

trict court added, "[T]here is no evidence that the assistant public defender in charge of Spreitzer's case was ever hampered by any alleged conflict of Dockery's, or that Dockery himself ever participated in Spreitzer's case in more than a titular capacity."

We review this issue, which involves both questions of law and questions of fact, using a *de novo* standard of review. *Enoch v. Gramley,* 70 F.3d 1490, 1496 (7th Cir.1995) (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 95, 136 L.Ed.2d 50 (1996). The Sixth Amendment right to effective assistance of counsel encompasses "a correlative right to representation that is free from conflict of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); *see also United States v. Cirrincione,* 780 F.2d 620, 624 (7th Cir.1985). "It is well settled that '[a] criminal defendant is entitled to counsel whose undivided loyalties lie with the client.'" *Stoia v. United States,* 109 F.3d 392, 395 (7th Cir.1997) (citations omitted). Therefore, a defendant may bring an ineffective assistance of counsel claim premised on the fact that he and his attorney possessed divergent interests. *Id.*

To evaluate these claims, we normally use the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), whereby the defendant must demonstrate that his attorney's performance was deficient and that the deficiency prejudiced him. However, where a conflict of interest provides the predicate for an ineffective assistance claim, a defendant bears a lighter burden with regard to demonstrating prejudice. *United States v. Horton,* 845 F.2d 1414, 1418 (7th Cir.1988) (citations omitted); *see also United States v. Fish,* 34 F.3d 488, 492 (7th Cir.1994). "But for" prejudice need not be shown in these situations because "the existence of a conflict itself demonstrates a denial of effective assistance of counsel." *Fish,* 34 F.3d at 492 (citing *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1718–19). "This presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure." *Id.* (citing *United States v. Ellison,* 798 F.2d 1102, 1107 (7th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987)).

The extent to which a defendant asserting a conflict of interest must demonstrate prejudice depends on whether and to what extent the alleged conflict was brought to the trial court's attention. *Fish,* 34 F.3d at 492; *see also United States v. Cook,* 45 F.3d 388, 393 (10th Cir.1995).

In *Holloway v. Arkansas,* the Supreme Court held that if the defendant or his attorney raises the issue or the trial judge otherwise knows or reasonably should know of the alleged conflict of interest, the judge must inquire adequately into the potential conflict. 435 U.S. 475, 484–91, 98 S.Ct. 1173, 1178–82, 55 L.Ed.2d 426 (1978); *see also Fish,* 34 F.3d at 492; *Horton,* 845 F.2d at 1418. Otherwise, a reviewing court will presume prejudice upon a showing of possible prejudice. *Fish,* 34 F.3d at 492; *Horton,* 845 F.2d at 1418 (citing *Holloway,* 435 U.S. at 484–91, 98 S.Ct. at 1178–82; *Walberg v. Israel,* 766 F.2d 1071, 1075 (7th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *United States v. Marrera,* 768 F.2d 201, 205 (7th Cir.1985)). Thus, as we summarized in *Fish,* "when a timely objection is made and the court fails to inquire adequately into the possibility of conflict, a reviewing court will presume prejudice, even without a showing of an actual conflict of interest." *Fish,* 34 F.3d at 492 (citing *Holloway,* 435 U.S. at 484–91, 98 S.Ct. at 1178–82; *Horton,* 845 F.2d at 1418). If, on the other hand, the defendant does not make a timely objection or the trial court is not otherwise apprised of the possible conflict, then the reviewing court will presume prejudice only if the defendant can show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler,* 446 U.S. at 348–49, 100 S.Ct. at 1718; *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *see*

*also Horton*, 845 F.2d at 1418.[7]

Spreitzer argues that we should apply the *Holloway* standard and reverse his conviction because he believes the trial court was aware of Peter Dockery's alleged conflict and therefore had a duty to inquire into it. Spreitzer argues that the court became aware of the alleged conflict three times: (1) when Dockery became an Assistant Public Defender and the above-quoted conversation occurred; (2) when Dockery became the Du Page County Public Defender and his name began appearing on pleadings before the court; and (3) at sentencing, when Anfinson attempted to call Dockery to the stand to testify as to Illinois' mandatory natural life sentence. Spreitzer therefore contends that the trial court knew or should have known that Dockery had a conflict of interest in representing Mr. Spreitzer in any capacity, and that the trial court should have made an inquiry as required by *Holloway*.

 We agree that *Holloway* provides the correct standard to apply to Dockery's status in this case. Our review of the record suggests that the trial judge was adequately and clearly apprised of the potential conflict of interest when Dockery was initially hired, as well as when Anfinson proposed calling Dockery as a witness. On that issue, we disagree with the Illinois Supreme Court's determination that the "potential conflict was not brought to the attention of the court." However, we also disagree with Spreitzer that the trial judge shirked his duty of monitoring the situation in terms of the alleged conflict of interest. We believe that the judge was adequately informed of the nature of the conflict and correctly admonished that Dockery could not be involved in the case. We fail to see how the trial judge's insistence that Spreitzer be represented by a different attorney in the Public Defender's office violated Spreitzer's right to effective assistance of counsel. The trial judge took adequate steps when he stated that Dockery would not be able to represent Spreitzer and when he required another attorney in the office to handle the case. The judge was also correct (in terms of the conflict situation only) when he refused to allow Dockery to testify as an expert witness during sentencing. As for Anfinson, we defer to the Illinois Supreme Court's reasoning that she would not be disqualified from representing Spreitzer merely because another member of her office had at one time been a state's attorney on the other side.[8] The Illinois Supreme Court found, and we agree, that "the asserted disjunction between Anfinson's duty to her client and her supposedly conflicting loyalty to Dockery is extremely speculative and remote." *Spreitzer I*, 123 Ill.2d at 22, 121 Ill.Dec. 224, 525 N.E.2d at 38.

 The *Holloway* standard still applied when Dockery was elevated to the position of

7. The Illinois Supreme Court maintains that the *Cuyler* standard is limited to conflict cases involving multiple representation of criminal defendants. *People v. Washington*, 101 Ill.2d 104, 77 Ill.Dec. 770, 461 N.E.2d 393 (1984), *cert. denied*, 469 U.S. 1022, 105 S.Ct. 442, 83 L.Ed.2d 367 (cited in *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1313 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987)). Moreover, at least one federal court has also held that the *Cuyler* analysis is only applicable to cases of multiple representation. *See Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996). Our Court, however, has said, "The precise scope of the category of claims to which the *Cuyler* standard applies has not been definitively stated by the Supreme Court." *O'Leary*, 806 F.2d at 1312. In dicta, the Supreme Court has also indicated that it will treat categories of conflict-of-interest cases the same, without limiting its application to multiple representation conflict claims. *Strickland*,

466 U.S. at 692, 104 S.Ct. at 2067. Thus, we have routinely applied both the *Cuyler* and the *Holloway* standards to conflict of interest cases which are not multiple representation cases, and we do so here. *See O'Leary*, 806 F.2d at 1313; *see also Cook*, 45 F.3d at 393 (citing *United States v. Levy*, 25 F.3d 146, 153 (2d Cir.1994)).

8. The Illinois Supreme Court stated:

> [I]t would be ludicrous to disqualify Dockery or the Du Page County public defender's office from handling any cases which were initiated during Dockery's employment as an assistant State's Attorney and which were still pending at the time he became an assistant public defender or at the time he became the public defender. Such a rule would have the undesirable effect of discouraging public defender's offices from hiring competent former prosecutors.

*Spreitzer I*, 123 Ill.2d at 19, 121 Ill.Dec. at 231, 525 N.E.2d at 37.

Public Defender of Du Page County. The trial judge's initial comments carried over to the time when Dockery was promoted and the judge's admonition was still valid. Moreover, if Dockery felt that his elevation to the Du Page County Public Defender created a conflict of interest, the Public Defender's Office would have so informed the judge at that time. As we said in *Fish*, "Given defense counsel's duty to avoid conflicts of interest and to advise the court promptly upon discovery of a conflict, the trial court's reliance on defense counsel's own assessment regarding the potential for conflict was entirely reasonable." *Fish*, 34 F.3d at 493. "Indeed, it is the attorney confronted with a potential conflict who is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Id.* (citing *Holloway*, 435 U.S. at 485, 98 S.Ct. at 1179) (internal quotations omitted). As in *Fish*, Spreitzer has not pointed to any evidence supporting a conflict of interest after Dockery was elevated to the Public Defender. Nor does the record indicate that the asserted failure of the trial court to delve deeper into the alleged conflict prevented the unearthing of any material information necessary for the conflict determination. *See id.*

■ Assuming arguendo that the judge should have readdressed the potential conflict of interest when Dockery was promoted, the *Cuyler* standard would apply. Under *Cuyler*, Spreitzer would be required to show the existence of an actual conflict of interest which adversely affected Anfinson's performance. We find neither an actual conflict nor an adverse affect on Spreitzer's defense. The trial court made clear that Dockery could not have a role in Spreitzer's defense, and the record indicates that he did not play a role. The only instance in which Dockery was potentially involved was when, before sentencing, Anfinson proposed calling Dockery as a witness to testify about parole ineligibility under Illinois law. This proposal was rejected by the court. As counsel conceded at oral argument, there is no other evidence in the record that Dockery played any role whatsoever in Spreitzer's defense or that he participated personally in any decision-making regarding Spreitzer's defense.

The record does not indicate that Dockery was involved in Spreitzer's defense in any way other than in a titular capacity. Further, the record is replete with instances of the effective assistance of counsel that Ward and Anfinson both provided in Spreitzer's behalf through the Public Defender's Office. There is absolutely no evidence in the record that Ward or Anfinson was somehow affected by having a former prosecutor as a colleague or a supervisor. Spreitzer received a vigorous and thorough defense. We therefore affirm the district court's denial of this ground for habeas relief.

### B. Evidentiary Hearing.

Finally, Spreitzer argues that the district court erred in denying him a full and fair hearing to establish his claim of ineffective assistance of counsel on the pre-trial motion to quash his arrest and to suppress statements. Spreitzer argued in his post-conviction petition that during the pre-trial hearing on these motions, attorney Ward was ineffective in failing to investigate, locate, or present the testimony of witnesses who would have established the illegality of his arrest in this cause. Spreitzer also argued that he was prejudiced by Ward's failure to investigate. *See Spreitzer II*, 143 Ill.2d at 215, 157 Ill.Dec. at 469, 572 N.E.2d at 933. Spreitzer argues that he has never been able to flesh out this claim because the Illinois court hearing his post-conviction petition dismissed the claim without conducting an evidentiary hearing, and all reviewing courts have subsequently determined that he was not entitled to an evidentiary hearing. *See Spreitzer II*, 143 Ill.2d at 215–20, 157 Ill.Dec. at 469–71, 572 N.E.2d at 933–35. We agree with these reviewing courts' decisions not to grant an evidentiary hearing.

### 1. Pre-trial Motion to Quash.

Spreitzer was arrested in conjunction with the Sutton murder on November 5, 1982. Prior to trial, Spreitzer filed a motion to quash the arrest on the grounds that probable cause was lacking at the time the police took him into custody. He also filed a motion to suppress statements he made on No-

vember 5 and 8, 1982, as fruits of the unlawful arrest. His statements dealt with his involvement in a number of murders, including that of Linda Sutton. As the Illinois Supreme Court noted, the issue was whether Spreitzer "was arrested by the police before or after he had made the incriminating statement which provided the probable cause for his arrest." *Spreitzer II,* 143 Ill.2d at 215, 157 Ill.Dec. at 469, 572 N.E.2d at 933.

Spreitzer himself was the only witness who testified in support of the motion to quash. He testified that he was arrested on November 5, 1982 at 10:30 p.m. near the garage of his mother's house. He testified that during the arrest, Detective Thomas Flynn and his partner asked Spreitzer his name and told him that they wanted to "bring him in" to ask him some questions. Spreitzer testified that they pushed him against a car in the rear of his mother's house, patted him down and handcuffed him behind his back, placed him in the backseat of a squad car and took him to a police station where he was held in custody for five days and questioned repeatedly.

Detective Flynn and Du Page County Sheriff's Detective Warren Wilkosz both testified in opposition to the motion to quash. Detective Flynn testified that he stopped Spreitzer on October 20, 1982, in a van matching the description of a van used in the mutilation assaults of two prostitutes in Chicago. Spreitzer voluntarily went to the police station to be photographed for a photo lineup to be shown to one of the victims. Detective Flynn testified that, as a result of an investigation, Spreitzer agreed to take a polygraph examination on November 5. When Spreitzer failed to show up for the polygraph, he and his partner went looking for Spreitzer. They found him at 7:45 p.m. at his mother's house, and Spreitzer voluntarily accompanied them to the police station to take the polygraph exam at 8 p.m. He said that Spreitzer was not handcuffed or under arrest when he accompanied Flynn to the station. Flynn testified that after the exam, Spreitzer voluntarily accompanied him to another police station for further questioning, during which Spreitzer admitted his involvement in some homicides. Detective

Flynn testified that it was only after these admissions that Spreitzer was arrested. The trial court denied the motion to quash based on this evidence, finding that Spreitzer made incriminating statements prior to his arrest, and that these statements provided the probable cause for his arrest.

### 2. Post-conviction Petition.

In his initial *pro se* post-conviction petition, Spreitzer claimed that he had told his counsel, Ward, prior to the motion to quash that some of his mother's neighbors had seen the alleged arrest and had seen him handcuffed behind her house. Spreitzer argued that Ward was ineffective because Ward never tried to find these witnesses or interview them to determine whether they would corroborate Spreitzer's testimony.

 We evaluate ineffective assistance of counsel claims under the now-familiar two-pronged performance/prejudice standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Spreitzer can succeed on this claim only if he can show both that his counsel's representation fell below an objective standard of reasonableness, *id.* at 688, 104 S.Ct. at 2064–65, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, *id.* at 694, 104 S.Ct. at 2068. *See also Porter v. Gramley,* 112 F.3d 1308, 1312–13 (7th Cir.1997). Because ineffective assistance of counsel is a mixed question of law and fact, we review it under the standards announced in the newly-amended 28 U.S.C. § 2254(d)(1), which retroactively applies to pending cases. *See Lindh v. Murphy,* 96 F.3d 856, 868–71 (7th Cir. 1996), *cert. granted in part,* —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997); *see also Porter,* 112 F.3d at 1312–13. As indicated above, we may grant habeas relief on such a question only if the state court determination on the issue involved an "unreasonable application" of clearly established federal law as established by the Supreme Court. This means that a responsible, thoughtful answer reached after a full opportunity to litigate is sufficient to support the judgment. *Lindh,*

96 F.3d at 871 (quoted in *Porter*, 112 F.3d at 1312–13).

After the state court gave Spreitzer a thorough opportunity to address this issue on postconviction review both in written and oral argument, it reached a responsible, thoughtful conclusion in its *Strickland* analysis. The record is clear that Terry Ekl, who had been appointed to represent Spreitzer for the post-conviction petition, studied the issue and raised it in front of the judge. Prior to filing an amended postconviction petition on Spreitzer's behalf, Ekl stated to the court:

> I am going to need approximately another four weeks, Your Honor. There is one allegation raised in the [*pro se*] petition that I need to investigate. [Spreitzer] alleges that in conversations with prior counsel it was—the Defendant informed his other attorney of some potential witnesses who might have information relative to a motion to suppress. What I need to do is find those witnesses, interview them, to determine whether there is any substance to their observations and whether they would have had any value as witnesses and, therefore, whether that allegation would have any merit. So what I am going to need to do is have my private investigator locate these people, interview them, and then I can determine whether proper affidavits can be filed in support of the post-conviction petition. I think as it stands on its face, there are mere allegations without any support by way of affidavit or other verified pleadings that I need to file in order to have a post-conviction petition that has any substance.

Ekl filed an amended post-conviction petition on August 23, 1989. Ekl recognized that if any potential witnesses had statements that would benefit Spreitzer's position, they would need to be located and their statements would need to be taken. Nonetheless, he was still only able to attach one statement to the amended post-conviction petition. This statement was written by a neighbor, Marcella Rudnick, who lived two houses down from Spreitzer's mother. Rudnick's statement was unsworn and dated almost seven years from the date of the arrest. The statement read, in its entirety:

> I was in the living room window which faces South looking out at the street. It was early afternoon, the weather was clear and sunny. I saw Edward Spreitzer standing in the street handcuffed to the driver side door post of a police car parked in front of his house. He was alone, no police were in the area that I could observe. He appeared to be calm and uninjured from my view which is two houses West of his.
>
> I watched him for approximately five minutes then left the window. The last I saw of him was as I stated above.
>
> /S/ Marcella Rudnick 7–25–89

After reviewing the statement, the judge ruled that there was no basis to find a deficiency in Ward's performance. The judge concluded:

> There is no date specified, no time, she saw no police in the area. Defendant was calm, uninjured. She saw all of this from her window. She watched for a short while and then left her window. And the only corroboration of this, by review of transcript, was the arrest—not the arrest site, but the site in back of Defendant's home when certain investigation was being made. There was evidence that he was not handcuffed. This is referred to in both the transcript and in the officer's testimony. This in no way adds any new matter to the situation. Therefore, the Court finds the statement lacking a sufficient basis to support the petition. And all other matters in Count I were addressed at the motion to suppress hearing. Therefore, the allegations in the petition fail to measure up to a deficiency in counsel's performance.

Although the judge did not give Spreitzer a full-fledged evidentiary hearing after reviewing Rudnick's statement, Illinois does not give postconviction petitioners an automatic right to an evidentiary hearing. *People v. French*, 210 Ill.App.3d 681, 686, 155 Ill.Dec. 457, 461, 569 N.E.2d 934, 938 (2d Dist.1991) (citing *People v. Del Vecchio*, 129 Ill.2d 265, 279, 135 Ill.Dec. 816, 544 N.E.2d 312 (1989)). A hearing will be granted only

if the defendant makes a substantial showing of a violation of constitutional right and if the allegations are supported by the record or by affidavits accompanying the petition. *Id.* Because Rudnick's vague and probably contradictory statement was the only relevant information attached to the petition, the state court was more than reasonable in determining that Spreitzer did not make this substantial showing.

On appeal from the denial of the post-conviction petition, the Illinois Supreme Court quoted Rudnick's statement in its entirety and pointed out the many inconsistencies between it and Spreitzer's version of the events. The Illinois Supreme Court concluded: "[R]egardless of whether or not defense counsel was ineffective in not investigating the witness, the statement of Marcella Rudnick does not provide the probability of doubt that could lead to a retrial. Since the defendant cannot show that he was prejudiced by defense counsel's alleged error, it was proper for the trial court to dismiss this issue without an evidentiary hearing." *Spreitzer II,* 143 Ill.2d at 220, 157 Ill.Dec. at 471, 572 N.E.2d at 935. On habeas review, the district court agreed that Spreitzer had failed to meet either prong of the Strickland test for ineffective assistance and therefore his claim must fail.

### 3. Ineffective Assistance.

We are convinced that the Illinois courts did not make an unreasonable determination on this issue, and that Spreitzer is not entitled to habeas relief. Spreitzer's trial counsel acted reasonably in not seeking to have Rudnick's testimony admitted in an evidentiary hearing when this testimony was at such odds with Spreitzer's testimony. In the face of consistent testimony by the two police officers, Ward made a reasonable strategic decision not to call inconsistent witnesses for Spreitzer's position. Ward was presumably aware of the Rudnicks during the trial since Rudnick's husband, William, testified at sentencing. It is fair to say that Ward likely made a tactical decision not to call Rudnick to the stand because her testimony was unhelpful at best. *Pittman,* 960 F.2d at 691 (citing *United States v. Rush,* 890 F.2d 45, 51

(7th Cir.1989)). At the post-conviction hearing, Spreitzer claimed that neighbors who allegedly had seen the arrest had told his family that the police had taken him into custody. However, Respondents correctly point out that when asked how she learned that Spreitzer was in custody, Spreitzer's mother responded: "I had two officers come to the house on late Saturday night to question us about Ed, and that's how we found out he was in jail." Also, William Rudnick testified that he heard from Spreitzer's mother that Spreitzer was charged with the murders. In the face of this inconsistent testimony, we are certain that not only did the Illinois courts reasonably determine that Ward was not ineffective, but that Ward's performance at this hearing was not deficient.

Additionally, Spreitzer is unable to make the requisite showing of prejudice under *Strickland.* Because Rudnick's statement is contradictory to Spreitzer's testimony, the statement could only have curtailed Spreitzer's credibility and undermined his position that he was arrested and did not go voluntarily to the police station. Spreitzer has not supported his claims by presenting names of other witnesses who will testify in his defense or by identifying the specific evidence such witnesses could offer. He is unable to show that the result of the proceeding would have been different if Ward had investigated or located any other witnesses.

### 4. The Need for an Evidentiary Hearing?

Spreitzer argues that the district court, like the Illinois post-conviction court, should not have decided the merits of the ineffective assistance claim without conducting an evidentiary hearing. He argues that, despite the discrepancies between Rudnick's, Spreitzer's, and the officers' testimony, "[o]nly an evidentiary hearing in which Rudnick is observed testifying will permit a fair determination of whether such testimony creates a reasonable likelihood that the trial judge would have concluded that Spreitzer was indeed arrested without probable cause." Spreitzer relies on *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), *overruled in other respects by*

*Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). *Townsend* instructed: "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." 372 U.S. at 312–13, 83 S.Ct. at 757.[9]

■ We review the district court's denial of Spreitzer's request for an evidentiary hearing on his ineffective assistance of counsel claim *de novo. Kavanagh v. Berge,* 73 F.3d 733, 737 (7th Cir.1996). This Court recently said that a district court "may employ a variety of measures in an effort to avoid the need for an evidentiary hearing" on disputed facts. *Bracy v. Gramley,* 81 F.3d 684, 693 (7th Cir.1996) (quoting *Blackledge v. Allison,* 431 U.S. 63, 81, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977)), *cert. granted in part,* — U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997); *see also Porter,* 112 F.3d at 1317–18. On the other hand, "an eviden-

tiary hearing is not necessary when the facts essential to the consideration of the constitutional issue are already before the court." *Id.* (citing *Matta–Ballesteros v. Henman,* 896 F.2d 255, 258 (7th Cir.1990)).

■ Our cases have followed *Townsend* and its codification in the old 28 U.S.C. § 2254(d) to guide it in analyzing whether evidentiary hearings should have been granted. *Kavanagh,* 73 F.3d at 737; *United States ex rel. Simmons v. Gramley,* 915 F.2d 1128, 1138 (7th Cir.1990); *see also Porter,* 112 F.3d at 1317–18. We apply a two-step test to determine whether a petitioner is entitled to an evidentiary hearing. First, the petitioner must allege facts which, if proved, would entitle him to relief. *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756–57; *Pittman v. Warden,* 960 F.2d 688, 691 (7th Cir.), *cert. denied,* 506 U.S. 880, 113 S.Ct. 229, 121 L.Ed.2d 165 (1992). If the petitioner satisfies this burden, he must then show that he did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding, in order to win an evidentiary hearing. *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756–57.[10]

9. *Townsend* went on to indicate in a footnote to this point that the Court did "not mean to imply that the state courts are required to hold hearings and make findings which satisfy this standard, because such hearings are governed to a large extent by state law." *Townsend,* 372 U.S. at 313 n. 9, 83 S.Ct. at 757 n. 9.

 *Townsend* held that a federal court must grant an evidentiary hearing to a habeas applicant if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) *the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing;* (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) *for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.* 372 U.S. at 313, 83 S.Ct. at 757 (emphasis added). Spreitzer relies on parts three and six for his claim that he was denied a full and fair hearing by the state court.

 In *Resnover v. Pearson,* 965 F.2d 1453, 1456 (7th Cir.1992), *cert. denied,* 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993), we recognized that *Townsend* was overruled by *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). In *Keeney,* the Supreme

Court held that the "cause and prejudice" standard, not the fifth *Townsend* factor, is the correct standard to apply in excusing a habeas petitioner's failure to develop a material fact in state-court proceedings. *Keeney,* 504 U.S. at 8, 112 S.Ct. at 1719. Despite *Keeney,* our Court and other federal courts have continued to cite *Townsend* approvingly, indicating that *Keeney* overruled *Townsend* only to the extent of the fifth factor. *See, e.g., Porter,* 112 F.3d at 1317–18; *Bracy v. Gramley,* 81 F.3d 684, 693 (7th Cir. 1996), *cert. granted in part,* — U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997); *Kavanagh v. Berge,* 73 F.3d 733, 737 (7th Cir.1996). Because Spreitzer's argument focuses on the third and sixth *Townsend* factors, we find no reason to apply the "cause and prejudice" standard from *Keeney.*

10. On appeal, Spreitzer does not claim that anything in either the old or the new § 2254 entitles him to an evidentiary hearing. The new provisions of § 2254(e)(2) provide that a federal court may not grant an evidentiary hearing on claims that a habeas petitioner could have developed in state court proceedings unless: (1) the claim relies on a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court or (2) the petitioner shows a factual predicate that could not have previously

■ Spreitzer has not alleged facts which would show that Ward was ineffective during the motion to quash arrest. The facts allegedly in dispute concern when Spreitzer made the incriminating statements to the police that gave them probable cause to arrest Spreitzer. The relevant facts to this inquiry were clearly before the trial court both at the motion to suppress and at the postconviction stage, and were carefully considered. Moreover, the Illinois Supreme Court carefully considered Spreitzer's allegations and reviewed Rudnick's statement thoroughly. As we indicated above, putting Rudnick on the stand or even presenting her statement at the motion to quash would not have entitled Spreitzer to relief. Moreover, Ekl was similarly unable to come up with affidavits or statements by anyone else who could corroborate Spreitzer's testimony about the arrest.

In any case, even if Spreitzer had alleged facts that would entitle him to relief, which we are certain that he has not, Spreitzer is unable to clear the second hurdle for winning an evidentiary hearing—he cannot show that he did not receive a full and fair hearing in state court. The Illinois trial court *did hold* a full and fair hearing on the motion to quash arrest and to suppress statements. The hearing involved testimony both from Spreitzer and from the police officers, and both parties had the opportunity to cross-examine the witnesses. The Illinois post-conviction court also considered all of the information

that Ekl presented and reviewed Rudnick's statement. Nothing else was presented to support Spreitzer's story. In sum, Spreitzer was afforded a fair opportunity to present this claim in state court proceedings. *See Resnover v. Pearson*, 965 F.2d 1453, 1457 (7th Cir.1992), *cert. denied*, 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993).

■ As we recently said in *Porter*, "The relevant question on habeas review ... is not so much whether a petitioner has had all the trappings of a full evidentiary hearing, but rather whether the petitioner received 'careful consideration and plenary processing of [his claim,] including full opportunity for presentation of the relevant facts.'" *Porter*, 112 F.3d at 1317–18 (quoting *Blackledge v. Allison*, 431 U.S. 63, 82–83, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977)). Although, as in *Porter*, it is technically correct that Spreitzer did not receive all the trappings of a formal evidentiary hearing, we are certain that Spreitzer's allegations have been more than carefully reviewed, and that he is not entitled to any more evidentiary hearings. Such hearings would, at best, be "little more than the proverbial fishing expedition." *Porter*, 112 F.3d at 1318–19.

An evidentiary hearing will not change the outcome. The trial court, the post-conviction court, and the Illinois Supreme Court all had the relevant evidence before them to reasonably conclude that Spreitzer did not receive ineffective assistance of counsel.[11] We also

been discovered through the exercise of due diligence. 28 U.S.C. § 2254(e)(2)(A). Further, the *applicant must show the proffered facts underlying the claim* "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B) (cited in *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1298 (7th Cir.1996)). We said in *Pitsonbarger* that it is unclear whether the new rule of § 2254(e) may be applied retroactively. We therefore do not address it here, and apply the *Townsend* standard.

In *Burris v. Parke*, 948 F.Supp. 1310, 1325–26 (N.D.Ind.1996), the district court determined that § 2254(e)(2) could be retroactively applied based on *Lindh v. Murphy*. If this section were retroactively applied, it is clear that Spreitzer cannot meet the requirements of the section and would not be entitled to an evidentiary hearing on this claim. *See Porter*, 112 F.3d at 1317 n. 8.

11. We have recently explained that ineffectiveness claims based on counsel's performance at an argument for the suppression of evidence cannot be successful because the damage done by an inept attorney in this context does not constitute prejudice as defined by *Strickland. United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir.1997) (*citing Holman v. Page*, 95 F.3d 481, 490–92 (7th Cir.1996)). If the question before us was whether Spreitzer was improperly arrested, it "would be largely academic by now." *Holman*, 95 F.3d at 489 (citing *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). As in *Holman*, there is no doubt that Spreitzer had a full and fair hearing in the trial court to litigate his Fourth Amendment claims. Spreitzer, like *Holman*, is trying to obtain relief by using the back door—bringing this claim as a Sixth Amendment challenge to his attorney's effectiveness rather than as a futile Fourth Amendment claim. Although we are mindful of the grave import of the fact that this is a capital case, we nonetheless refuse to allow Spreitzer his re-

conclude that Spreitzer is unable to make the requisite showing under either prong of the *Strickland* analysis. We therefore affirm.

## CONCLUSION

We REVERSE the district court's grant of habeas corpus on the sentencing issue, and AFFIRM the denial of the issues raised by Spreitzer on cross-appeal. The death sentence should be reinstated.

quested habeas relief by letting him in through the back door.